# CIRCUIT COURT OF BALTIMORE CITY.

Filed June 8, 1928.

See Cook vs. Howard, 155 Md. 7.

## CORNELIA A. GIBBS, ET AL.,
### VS.
## WILLIAM COOK.

*Charles Markell* and *Daniel R. Randall* for complainants.

*Robert R. Carman* and *J. Purdon Wright* for defendant.

O'DUNNE, J.—

Since the submission of the case at the conclusion of oral argument, I carefully read all the numerous authorities cited by counsel on both sides. These are not entirely harmonious, but if there is one fact that stands out prominently through all of them, it is the accepted proposition that each application for injunction must be decided upon the facts peculiar to each case.

*Analysis of Cases in Which Injunction Issued.*

After reading all the decisions, I grouped them into the following classification:

*Class I*—Where the legal questions arose merely upon the pleadings (by demurrer to the bill) without ascertaining what the real facts were by the taking of testimony, but being merely measured by the language in the pleadings. In all these cases the pleadings allege:

a. A strictly residential district;

b. Danger of contagion or disease;

c. Depression of real estate values;

d. Description of various classes of objectionable facts, such as noises, odors, noxious gases, flies, etc., of such general character as would be sufficient in law to make any place a nuisance *in fact*, irrespective of whether it was a funeral parlor, a grocery store, a factory or other character of commercial enterprise.

(Note—Without undertaking in each classification to group all the cases that come under the special classification, I have at least attempted to illustrate each class by reference to one or more cases.)

Illustrative of Class I, above, is Higgins vs. Block, 213 Ala. 209.

(Also illustrative of Class VI—exclusive residential section of Mobile, p. 212.)

*Class II*—Cases decided after taking of testimony (distinguished from mere allegations in pleadings) where the testimony supported one or the other, or all, or some combination of facts embraced in a, b, c and d, sub-divisions of Class I.

(1922) Cunningham vs. Miller, 178 Wisc. 22—(with a strong dissenting opinion that the injunction should be limited to restraining the objectionable features evidenced in the testimony, but not to the business as such).

Goodrich vs. Starrett, 108 Wash. 347 —(which case also belongs to Class VI—exclusive residential district).

*Class III*—Cases in which ordinances or statutory law regulated the location, and the funeral parlor sought location in face of city ordinances or statutes.

(Note—In some of these cases the Court sidestepped deciding the validity of the ordinance challenged.)

(1920) Meagher vs. Kessler, 147 Minn. 182—(also belonging to Class VI—exclusive residential district).

Tureman vs. Ketterin, 304 Mo. 221— (also belongs to Class IV—"Morgue"). (Also belongs to Class VI—exclusive residential district.)

*Class IV*—Cases in which either in the allegations in the pleadings, or in facts where testimony was taken, in which the place was a "morgue" as well as a funeral parlor.

Goodrich vs. Starrett, 108 Wash. 437; Tureman vs. Ketterin, 304 Mo. 221:

"The unknown dead in the morgue; the visits of relations seeking to identify them."

(1927) Bragg vs. Ives (Va.), 140 S. E. 656:

"Building to be used as an undertaking establishment and morgue."

(Decision being on demurrer to bill.)

Kaebler vs. Pennswell, 75 Ohio St. 278:

Statute prohibited the location of a "morgue" near residences, but did not restrict funeral parlors. What is a *morgue* was carefully and fully considered and its especially objectionable features not associated with the funeral parlor were emphasized.

*Class V*—Cases in which the common law conception of a nuisance is definitely extended by statutory enactment.

Goodrich vs. Starrett, 108 Wash. 437 —here the statutory definition of nuisance included anything which interfered with "comfortable enjoyment of life or property," a feature unknown to the common law.

(This case is also illustrative of Class II and of sub-divisions a, b, c and d of Class I.)

(Also belongs to Class IV—Morgue.)

*Class VI*—Cases in which funeral parlors were sought to be located in a *strictly residential district*.

(1926) Dillan vs. Moran, 237 Mich. 130:

"The fact that business has *reached* the district does not establish that it has *entered* it. The photographs show that the district is strictly a residential district."

At page 132, supra, Justice Snow concurred in the decision in this case with this additional comment:

"Funeral homes, during recent years in great numbers have been removed from business sections of cities, and have become established in purely residential districts." An undertaking business is not a nuisance per se. Where one has been allowed to establish itself to carry on a business as such in the residential part of the town, no one may disturb its continuance. It must not be understood that anybody, at any time, can complain of a funeral home in a residential section

and compel its removal. With this addition I concur."

Weisel vs. Crosby, 104 Neb. 643.

(Note—Eighty residents protested in a strictly residential district, in which property had been restricted as in Guilford and Roland Park, but the 25-year restriction had expired on the particular home purchased. There were other objectionable features which may be referred to in further distinguishing that case).

(1927) Street vs. Marshall (Mo.) 291 S. W. 494.

Exclusively residential district with the exception of a family hotel and church. All houses were occupied by the owners as family residences, and when built, were in a restricted area. The house was bought after restrictions expired, like the case above. This case also has some of the objectionable elements of Class II, to wit: (1) White ambulance, when not in use, was constantly standing on the boulevard near the premises; (2) hearse always parked on boulevard during services.

(1920) Meacher vs. Kessler, 147 Minn. 182—(this also belongs to Class III—ordinance class).

Leland vs. Turner, 117 Kan. 294—(also under Class III—ordinance—the validity of which was undetermined).

Most of the cases cited by the learned counsel for complainant may readily be distinguished on the facts of such cases.

For illustration, take Cunningham vs. Miller, 178 Wis. 22. Among the findings of fact by the Court in that case, was:

*Noise* incident to the work and audible to those nearby; the display of a large electric sign; not free from flies; offensive odors escaped; that it was in a district that for five or six blocks *in any direction* was free from business and *"essentially residential"* except for a few to the north and a drug store and one paint shop.

Take five or six blocks in every direction from this Cook location, and you would have enough stores and commercial houses to run a large size town, including a jail and a penitentiary, hotels, apartment houses, automobile sales and repair shops, railroad stations, freight yards, fire engine houses and a variety of stores.

But even in this case there was a strong dissenting opinion to limit the injunction to the evils incident to the operation and not restrict the business as such.

In Goodrich vs. Starrett, 108 Wash. 437, in which injunction was granted (also cited by complainant), the defendant removed his business to a house out of repair, one window entirely gone, others had broken glass, all without fly screens, or screens of any kind, except sash curtains. No proper sewerage connections to conduct a first-class *"morgue."* The establishment received those dying of contagious disease. There was evidence of great depreciation of value of property. In addition to all this, a local law extended the common law and included in nuisance (Sec. 8309) that *"which annoys, injures or endangers the comfort, repose, health or safety of others";* "obstruction to free use of property so as to essentially interfere with the comfortable enjoyment of life and property." It was also a *morgue.*

The Court, on page 442, said:

"Indeed it would seem that it is within the ordinary knowledge of mankind that the erection of an undertaking establishment *and morgue* in a district of a city suitable only for and used only for residence purposes would decrease the value of surrounding property."

The case most relied on by counsel for complainant seemed to be the Virginia case of Bragg vs. Ives, 140 S. E. 656, decided in 1927. It was not tried on the *facts,* but decided on a demurrer to the bill. The case is easily distinguished from the case at bar, in that the bill alleged the erection of a building to be used as an undertaking establishment and *"morgue."*

That alone, of being a *morgue,* would be sufficient to distinguish the case, but in addition thereto, was the allegation that it was located within 18 feet of the *well* of the complainant which supplied all his *drinking water.* (Presumably, a rural residential neighborhood.)

It was alleged to be a *"strictly residential community."* Further allegations were that noxious odors and gases would permeate the homes, making it inconsistent with health or pleasure to open their windows; that there

was danger of contagion and disease emanating from the *morgue* (page 660).

In other words, the allegations (admitted by demurrer to be true for purpose of Court decision), were of such character that the business occasioning such disorders would be a *nuisance in fact*, irrespective of what character of business it was.

The Court, however, in ruling on demurrer distinctly said that it expressed no opinion on the merits of the case, but only on the pleadings as alleged, and that the question of *fact* would be determined by the trial Court.

It required no argument to see that this case is no authority for the proposition here contended for.

How many of the six classes above enumerated have we present in the instant case?

We had in this case on demurrer to the bill in the first instance, a similar situation to that presented in Class I, where the allegations were broad. One of my predecessors (Judge Stanton), overruled the demurrer to the bill, upon the authorities just quoted, because of the broad allegations in this bill.

Answer was filed and testimony taken. The record does not show: Any unsanitary form of operation; no claim of disease or contagion; no suggestion of noise could well be made as to a location within two blocks of Union Station, on the main artery of automobile traffic to the heart of the city, with all the additional traffic of taxies from Belvedere Hotel, just to the south, which taxies have to traverse St. Paul street, because the entrance to the railroad station, by motor, is from the St. Paul street side.

Years ago St. Paul street, from the Court House to Union Station, was a "strictly residential section" of Baltimore. At its intersection with Centre street, it was one time the center of fashion. The hall where the cotillions were held, later became a stable for the horses of a large dairy company. Such was the condition there long after I came to the Bar. Today, I do not believe there is a strictly residential block on St. Paul street between the Court House and Union Station, and on even to North avenue. It is rapidly undergoing the same transformation that has overtaken Charles street within the same dimensions. The transition on Charles street is complete. The process on St. Paul street is rapid and definite in character. The Cook property in question is on the east side of St. Paul street near the north corner, south of Preston street. The block north on St. Paul street (the 1300 block intervening between Preston street and Mt. Royal avenue and Union Station), is all business, save two residences on the west side and the Earl Court Apartments on the south corner. And, if that is classed as a residence property, one should also include the greystone apartment house (converted dwelling) opposite. Preston street for two blocks east of Charles, and therefore, east and west of St. Paul street, is business, *intermingled* with dwellings, rooming houses, vacant houses and stores of not a very high grade variety, second-hand car dealers, cut-rate chain stores, grocery stores, etc.

The 1200 block St. Paul street, in which the Cook property in question is located, on both sides of the street, is part business, and part residence. Only three buildings on the east side of the block are used exclusively for residences. Of the 16 houses on the opposite side of the block, probably not more than six, if that many, are occupied as residences. The block includes, the Daiger advertising agency building, the Automobile Trade Association, the Pennsylvania Y. M. C. A. recreation rooms and pool room. In another building is the Baltimore Federation of Labor (exactly opposite the Cook property). Other properties are "for sale"; others "for rent"; others rooming houses and apartments; one closed with sign "for sale or for rent" standing for nearly eight years, and neither sold nor rented. On the north corner is the Charcoal Club, which can hardly be said to be exclusively "art for art's sake." Can anyone therefore, by the wildest stretch of the imagination, refer to such a block as of the kind described in the adjudicated cases, as *"a strictly residential neighborhood,"* or an *"essentially residential district?"* This is a description of the block itself. If the term is to include *"neighborhood"* or *"district,"* it would take in all the business in the next block west, the 1200 block Charles street, and all the business properties on Preston street. So that neither

considering the block as a unit in itself, nor the block as a part of a larger area, can it be designated as *"essentially residential,"* in character, by any kind of poetic license.

My recollection of the testimony in this case is that only two residents in the 1200 block St. Paul street, in addition to the complainant, Mrs. Gibbs, have testified in support of the complainant, or in this case, in anywise protested. I recall only Dr. Cotton on the Preston street corner, and Mr. Hack, next door to Mrs. Gibbs and also next door to Mr. Cook. The owner of one of the handsomest houses in the block was present in Court throughout the trial, accompanied by her husband, but neither was called to the witness stand. From the frequency of consultation with the counsel for complainant, I might assume they are sympathetic with that side of the controversy. Why not called as witnesses, I am not able to understand.

Whether the record of this case in an appellate Court can give the same picture of this location that I am familiar with, I do not know. My familiarity with it, of course, must be primarily from the testimony of the witnesses. In addition to that, I can not close my eyes to the location as I pass it almost daily, and some years back, lived for many years within a block of it, in a house which I then owned.

This property is structurally and geographically so located as to at least reduce to a minimum whatever objections, both sentimental and real, that are associated in the minds of some, if not all, with funeral homes. Built of substantial brown stone, of fine architectural design, there is no likelihood of it being transformed by any thing savoring of a "commercial front." The open court of ground to the south, is surrounded by a high stone wall, said to be 14 feet, and the back yard similarly enclosed. The long two-story brick garage (called "gymnasium" when the girls' school was there), obstructs view from Dr. Brinton's property on Preston and Calvert streets. An alley or driveway on both sides of this long garage makes an island, so to speak, of that part of the property —and permits rear access to the Cook property with an obscured view. No windows in either house to the north or south of it front on the yard or on the side of this property. There is a

bay-window on the east end or back of the Hack property, which bay-window projects eastward sufficiently to get a partial view of at least some of the yard of the Cook property. If this bay-window extends also to the third-story of the Hack property, I would imagine it would also afford a view of the Maryland Penitentiary, which contains the central place of execution for all capital punishment inflicted in the entire State of Maryland, as this institution is only a few blocks south, and just across the Fallsway, to the east. I do not know of any protest of the residents of this section that was made at the time the bill for "central place of execution" was pending, except the protest of the Warden of the Penitentiary himself, because "of the depressing effect on the inmates by reason of these *constant reminders of death."*

Christ Church is in the next block, south, on St. Paul street corner. I suppose all funerals of members of that parish are conducted at that church. The passing of funerals in that section is by no means infrequent. I do not mean by either of these references to be understood as wholly ignoring the effect of evidence that funeral parlors are not the most desirable neighbors one might wish to have. I can well understand a refined lady, of perfectly normal sensibilities, such as the complainant undoubtedly is, seriously objecting to the Winans' property, so close to hers, being used as a funeral parlor. I do think that some of the objections are magnified by a now stimulated imagination, and that the quaint expression, found in some of the adjudicated cases, and successively repeated by other judges, is largely a "poetic fiction." I refer to the formula "that constant reminders of death produce a feeling of depression which in turn weakens the power of resistance, and renders one thereby more liable to contagious diseases." I regard this so far fetched in fact as to be classed as a legal-medical fiction. It may have the effect of making the few remaining residents of that block look upon it as less desirable as a place of residence— because of sentimental associations now strong in their minds, but as far as depressing the real estate values of the block (except possibly for residential purposes), my judgment is that it will stimulate the strictly *commercial* values

of the block as a business center, and hasten the period of transition in the gradual evolution from residential to business character of the property. Whether the Cook funeral parlors operate there or not, that block, as well as that whole street, has long since been *doomed* as a residential section of Baltimore, and the change to a wholly business section is inevitable. There will be no monetary loss to any property owner by the advent of business. The sooner it comes, definite in character and whole in nature, the better for the commercial interests of the property owners in that locality. There is always sentimental attachment to a long established home, and we break away from ancient moorings with feelings of regret. No injunction against this particular business now operating there, can stem the tide of business occupation of that entire block, and entire street, from the Court House to North avenue, any more than the American Indians could arrest the march of civilization. They had better rights than those sought to be protected by the injunction invoked in this case. The essentially residential character of this district is but a pleasant memory of a by-gone day. It is now the heart of an up-town commercial center, in close proximity to Union Station, with the steel arteries of commerce soon to be expanded and reinforced with the Pennsylvania Railroad's twenty-two million dollar projected improvements and electrification of tunnels, all of which will be further reflected in the growth of automobile industry and its showrooms, now present a few doors from this property to the north, in the 1300 block, which auto business takes in the entire block, except Earl Court Apartments. Its transformation to a business section is an *accomplished fact.* The few remaining residences in that block can not change the result. They might have done so by more prudent forethought, had they not been expecting to reap the increased *business* values of the property, and protected themselves without invoking intervention of a Court of equity by means of injunction, had they been of a mind to do so. Years ago, before business got in the block, they might have "signed up the block" by restricted *covenants* running with the land, restricted it against sale for business

purposes; but, for commercial reasons, they wisely did not do so.

One further thought. It is not a restricted area. The contemplated use by defendant of his property in that block is not in violation of any provisions in the zoning law. Furthermore, no funeral parlor can locate and operate without a permit from the municipal authorities. This application has been made. Protests were filed, a public hearing was had. The city authorities appointed a committee to thoroughly study the situation and the effect elsewhere, in residential sections of Baltimore, of funeral parlors. They studied (according to the testimony in this case) some 37 locations of funeral parlors in Baltimore. The "Mitchell home" has been referred to on the corner of 1900 block Eutaw Place. The house compares favorably with any home in the 1200 block St. Paul street (judged from its exterior), the block itself is more beautiful in its settings, decidedly more strictly a residential section, with far less evidence of business locations. Now located there some two years, the evidence is there is no depreciation of values of property, no vacancies or sales by reason of the location there of the funeral parlor. At any rate, the municipal authorities, after a canvass of the situation, and after a protest, and a public hearing, formally granted the defendant Cook his permit for funeral parlor at that location, 1217 St. Paul street. He paid $90,000 for the property, and I see no sufficient legal reason why he should now be enjoined from occupying and using it for that purpose.

If, in the actual operation of it, there later be any valid occasion for well grounded legal complaint, the doors of the equity courts are always open to remedy any abuse which may be shown to exist in the manner of the conduct of such business.

As was said by the Vice-Chancellor in Westcott vs. Middleton, 43 N. J. No. 478:

"It is not within the judicial scheme to make things pleasant or agreeable for all the citizens of the State."

I feel constrained, therefore, to dissolve the temporary injunction and dismiss the bill of complaint, with costs. It will be so ordered.