MARION BOLLINGER ET AL., RESPONDENT, v. AMERICAN ASPHALT ROOF CORPORATION, APPELLANT.*

Kansas City Court of Appeals.  June 17, 1929.

*Corpus Juris-Cyc. References: Navigable Waters, 45CJ, section 4, p. 406, n. 23; section 18, p. 418, n. 13; Nuisances, 46CJ, section 37, p. 671, n. 62; section 171, p. 706, n. 20; section 467, p. 812, n. 78, 79; section 470, p. 814, n. 20; section 503, p. 827, n. 16; p. 828, n. 19; p. 829, n. 20; Trial, 38Cyc, p. 1601, n. 52.

*N. R. Fisher* and *Cowgill & Popham* for respondent.

*Gossett, Ellis, Dietrich & Tyler* for appellant.

LEE, C.—This is an appeal from a judgment for damages claimed to have been caused to the boating business, property, premises and personal convenience and enjoyment of plaintiffs, by the maintenance and operation of defendant corporation's roofing plant, near 15th Street and the Blue River, in Kansas City, Missouri.

The Blue River rises in the State of Kansas and runs into Jackson County, Missouri, somewhere south of the city limits of Kansas City, and flows generally northward, through Swope Park and through the city, with many meanderings, to its junction with the Missouri River near and just outside the northeast city limits. After crossing 15th Street one of its curves is slightly east of north to 13th Street (near which the city has constructed a dam, known as the Guinotte Dam), and then on to 12th Street and beyond. In the

year 1927 the city completed a large main sewer running down the Blue River Valley from the south. Prior to that the river was an open sewage conduit, into which was discharged, directly or indirectly, all the sewage from approximately 22,000 acres, or sixty per cent of the city's area. Plaintiffs own a tract of land fronting 202 feet along the west river bank to the north of 15th Street, with a depth of thirty feet abutting on that street and a depth of 125 feet on its northern side, due to the eastward turn of the river. For ten or twelve years prior to 1920, and for three or four years thereafter, plaintiffs had lived with their family in a two story building on said land, in which they had four living-rooms, and the rest fitted up as a locker-room with 100 lockers, club room and boat-house. Plaintiff Marion Bollinger testified that in 1921 he had about 100 boats and a motor boat, which he rented for hire; and also stored boats for others. He also served refreshments, soft drinks and tobacco for his patrons and the public.

In 1920 defendant corporation acquired the ground north of plaintiffs' property, extending nearly or quite to 12th Street; and also that on the west, or rear, of plaintiffs' land, and erected a substantial plant for the manufacture of asphalt roofing.

Plaintiffs' petition alleges, in substance, that defendant has wrongfully caused and permitted oil, noxious fluids and odorous compounds to escape from the plant into the stream, rendering it useless for boating purposes; that defendant has caused and permitted quantities of soot, smoke, fumes, odors and noxious discharges to escape from the plant, damaging and destroying plaintiffs' trees and shrubbery, buildings, boats and objects thereon, and rendering the premises uninhabitable and valueless for boating or habitation; that plaintiffs had maintained their home and conducted a profitable boating business therefrom, and that defendant had knowingly caused, created and continued the nuisances set forth; that defendant had piled junk and refuse on plaintiffs' land; that large quantities of oil and noxious fluids and compounds were released and allowed to settle about the banks of the stream and on plaintiffs' property, subjecting plaintiffs and their customers to having their shoes and clothing besmirched; that the boats were likewise bespattered, damaged and ruined, and plaintiffs' business had been thereby destroyed and their boats and property rendered practically worthless; that plaintiffs had been so disturbed in the peaceable enjoyment of their property and home that they were compelled to move, and the rental value of their property was destroyed; and that all these things complained of constituted a nuisance and a violation of plaintiffs' rights, and resulted in a material depreciation in the value and salability of their property.

The answer was a general denial; also that the cause of action did not accrue within five years before the commencement of the action.

There was a verdict and judgment for plaintiffs for $3,000, from which defendant brings this appeal.

At the trial plaintiffs introduced substantial testimony tending to sustain their claim as to the condition of the river and of defendant's alleged responsibility therefor. Defendant introduced testimony tending to show that the river had prior to 1920 become practically unusable for boating, because of the sewage; that the conditions complained of by plaintiffs were the result of the sewage, and that the completion of the new city sewer had relieved and corrected the objectionable situation; that there were many other factories in the vicinity, which was a manufacturing district, and that four railroads passed nearby; that the plant was so run that there was no more than an infinitesimal discharge of oil, and none of tar or creosote, which they did not use; and that their own employees, including eight women, breathed the same atmosphere without annoyance or complaint.

Appellant assigns as error the refusal of the court to give its requested instruction C, as follows:

"The court instructs the jury that the nuisance complained of, if any, was a permanent one and not a continuing one, and existed with the knowledge of the plaintiff more than five years before the filing of the action, and therefore your verdict must be in favor of the defendants and against the plaintiff."

This action was commenced on September 30, 1926. The evidence shows that appellant's plant was completed and operations begun therein on October 1, 1920; and appellant contends that it has continued to operate in substantially the same manner ever since that date (save for some improvements in method.) From this appellant argues that, whatever the damage to plaintiffs' property, it was fully clear and evident from the first day of operations; and that the nuisance then created, if any, was of a permanent nature, and that any right of action therefor was barred by section 1317, Revised Statutes 1919, prior to the bringing of this action.

The reported cases make a clear distinction in principle between those in which the erection or construction becomes a nuisance from the manner in which it is used, and those in which the erection is a permanent structure, the natural and evident effect of which from the first is to create a nuisance, though the effects may be gradual. Of the latter sort are the cases cited by appellant of Smith v. Sedalia, 152 Mo. 283, 53 S. W. 907; 182 Mo. 1, 81 S. W. 165; 244 Mo. 107, 149 S. W. 597, which involved a city sewer, and DeGeofroy v. Merchants' Bridge Ter. Ry. Co., 179 Mo. 698, 79 S. W. 386, which involved an elevated steam railway on a public street, upon which

plaintiff's land abutted. In these cases it was held that the right of action accrued at the date of the original construction, and the Statute of Limitations ran from that date. In the case of Howard County v. C. & A. R. R. Co., 130 Mo. 652, 32 S. W. 651, an action for damages to plaintiff's bridge was filed in the year 1893. In holding that the claim was not barred by the Statute of Limitations the Supreme Court said:

"While the evidence tended to prove that the obstructions thrown into the stream by defendant's servants in 1885, changed the current of the stream so that in the fall of that year the water began to flow against the pier, it also tended to prove that no actual or material injury was done to the pier until within a period of five years next before the suit was brought, and the court so found and held that plaintiff's action was not barred. In this we think the court committed no error. While there is some conflict between the American cases on this subject, the rule sustained by the great weight of authority seems to be that when by wrongful acts a permanent nuisance is created and the injury therefrom is direct, immediate and complete, so that the damages can be immediately measured in a single action, the statute will begin to run from the erection of the nuisance. On the other hand, when the injury, as in this case, is not complete so that the damages can be measured at the time of the creation of the nuisance in one action but depends upon its continuance and the uncertain operation of the seasons, or of the forces set in motion by it, the statute will not begin to run until actual damage has resulted therefrom."

In the case of Powers v. St. Louis, I. M. & S. R. R., 158 Mo. 87, defendant had constructed a canal whereby the river channel was changed, causing the current to suddenly turn in an acute angle. As a result plaintiff's land was gradually washed away and flooded. The canal was completed in 1868, and the suit was begun in 1895. The court distinguished the case from the Howard County case, supra, and held that the *cause* of the damage was complete and visible in 1868, and held that no damages were recoverable. In the course of its opinion the court said:

"They practically claim that this is continuing nuisance, and that the damages are apportionable and can be sued for separately, until eternity, as often as a further *quantum* of damage is done. This is untenable. The evidence shows, and common sense demonstrates, that the damage has been and must be gradual, and that it began as soon as the permanent canal was built, and must continue until a bend is formed which will stop the wearing away of the bank. This began in 1868. At that time C. T. Tullock owned the land, . . . until 1882, and all the time (fourteen years) this process of gradual wearing away was going on. He made no complaint. The cause of

action to complain and to recover full compensation for all damages, present and prospective, was therefore barred as to Tullock, when he sold the land to the plaintiffs in 1882. They took the land in this condition, used it, saw the process of wearing away going on . . . from 1882, to 1895 (thirteen years), and made no complaint, and at the expiration of twenty-seven years from the time the cause of action accrued, and the damages had become apparent, and susceptible of computation, they sued the defendant and recovered nearly half as much as damages as they paid for the whole tract of 537.52 acres of land.

"The claim is clearly barred by limitation. The original construction of the canal was unworkmanlike, defective and negligent, and necessarily produced the results complained of, but the time has long since passed when an action therefor could be maintained. The structure was permanent, the damage apparent and measurable, and could only be recovered in a single action. It is in no proper sense a continuing nuisance, where the damages are apportionable."

In the case of Hayes v. St. Louis & S. F. R. R. Co., 177 Mo. App. 201, 162 S. W. 266, defendant built a railroad embankment which caused an overflow on plaintiff's land. The opinion reviews the cases on the subject, and says:

"It is stated thus in 29 Cyc. 1254: 'Where a nuisance is of such a permanent character that a single recovery can be had, including the whole damage past and future resulting therefrom, there can be but one recovery, but where the nuisance is of a continuing (abatable) nature, each continuance gives rise to a new cause of action and successive actions may be maintained for the damages accruing from time to time;' and again, at page 1260: 'Statutes limiting the time within which actions may be brought apply to actions for damages for nuisances, and where the nuisance is of a permanent character the period runs from the time when the injury was done or the structure complained of erected; but where the nuisance is a continuing one an action for injuries from the continuance may be brought after the lapse of more than the statutory period since the creation of the nuisance, although in such case the recovery is limited to damages for the statutory period preceding the commencement of the action.'

"Then it should be borne in mind that it is the character of the source or cause of the injury as to being permanent or temporary rather than the character of the injury itself that determines to which class it belongs. In 29 Cyc. 1154, these terms are defined thus: 'A permanent nuisance is one of such a character and existing under such circumstances that it will be presumed to continue indefinitely, and as a rule consists of some building or structure. Nui-

sances consisting of acts done, or particular uses of property, may be properly termed continuing when they are of such a character that they may continue indefinitely, or on the other hand may be discontinued at any time.' The permanent injury, a cause of action for which is single and accrues once for all, may be permanent either from the inherent nature of the injury itself, as going to the destruction of the estate or its beneficial use, or from the nuisance or cause of the injury being permanent. The effect is permanent whether arising from a single act or from a constantly recurring series of acts from the same permanent cause.''

In the light of these decisions it seems clear that the erection of defendant's plant for manufacturing purposes cannot be said to have been a nuisance *per se*, or such as in itself was notice or evidence that it would be operated and maintained in a way to constitute such a nuisance. There is nothing in the character of the structure which would in any way prevent it from being maintained indefinitely without· offense to anyone. The things complained of are due to the manner of its use.

By their very nature the things involved in the manner of use of the plant are abatable, and the evidence shows that some of them in this case were in fact abated in part; for example, by the erection of a sixty-foot condenser-stack in 1923, for the disposition of fumes and smoke, as a result of which plaintiff testified he ''might be able to live there now.''

In 37 Corpus Juris, p. 887, it is stated:

''Moreover, in applying the rule as to permanent nuisances a distinction must be made between cases where a structure of itself constitutes a nuisance or an actionable wrong, and cases where it becomes such only in connection with other causes operating from time to time. In the latter case the erection and maintenance of a structure constitutes no invasion of plaintiff's rights and while the structure may be permanent, the nuisance is not. Hence, where the structure is permanent but the nuisance is transient and recurrent. depending upon accidents and contingencies, successive actions may be brought for each injury as it occurs and the statute will run in each case only from the time of the injury.

''While it has been said that there is no fixed rule by which to determine whether a given structure is permanent, and the difficulty of determining the question is recognized, permanency of a structure is not to be determined from the single consideration of its enduring character, or from the fact that if not changed by the hand of man it will probably continue forever. To be permanent in a legal sense the structure must not only be enduring, but must be such .that its continuance is lawful; because if not lawful it may be. removed or abated and therefore cannot be deemed permanent.

Therefore a nuisance resulting from a cause which may legally be abated is not regarded as a permanent source of injury but as a continuing nuisance within the rules by which successive actions may be brought for the resulting damages as they from time to time occur, and by which a recovery may be had for all such damages as have accrued within the statutory period before the action.''

The court did not err in refusing to give defendant's instruction ''C.''

Appellant contends that plaintiffs' evidence of damages was too vague and speculative to be the basis of any verdict or judgment. Plaintiffs' instruction No. 3 on the measure of damages was as follows:

''The court instructs the jury if your verdict is for plaintiffs you should award such damages as you believe from the evidence to be reasonable and fair compensation to them for any depreciation in the rental value of their residence during the five years next preceding September 26, 1926, if any, which you believe from the evidence to be the direct result of smoke, fumes and refuse, if any, referred to in evidence, coming upon their said premises from the plant of defendant, if you so find, during said period, not exceeding for this item $1000; also such damages as you believe from the evidence will fairly and reasonably compensate Marion Bollinger for any real and substantial inconvenience and annoyance and discomfort and interference, if any, of his family and himself in the use and occupation and enjoyment of said home during said period which you believe from the evidence to be the direct result of smoke and fumes and refuse, if any, referred to in evidence, coming upon his said premises from the plant of defendant, if so, during said period; and if you believe from the evidence that the Blue River at said place and during said period was not a navigable stream, as defined in the instructions herein and that prior to and during said period plaintiffs owned boats and profited by hiring them and renting lockers and boat storage and were utilizing their private dock and said property for said business, if so, and that within and during said period defendant caused and allowed oily matter and tar-like liquid and substances and refuse, referred to in evidence, to come from its roofing plant and premises, if so, and to enter on the land of plaintiffs and to enter the water and settle in and on said stream in front of and about the dock and premises of plaintiffs, if so, and that as a direct result thereof the boats of plaintiffs were spattered and partially covered with said oily or tar-like substances, if so, referred to in the evidence, and the water thereat and thereabout became permeated and saturated therewith, if so, and that thereby their said boating business was damaged and impaired and partially destroyed and they were caused during said period to

lose substantial business and customers and profit thereby, if you so find, then by reason thereof you will assess such further damages as you believe from the evidence will fairly and reasonably compensate plaintiffs for their loss, if any, of profits from said boating business during said period resulting to them directly from the presence of said oils and substances from the plant of defendant, if so, as above set forth; but your whole award, if any, cannot exceed $25,000, and will be stated in a lump sum.

"The court mentions amount solely because such is sued for and does not thereby or in any way intend to intimate for whom or for what, if anything, your verdict should be."

It will be noted that this instruction authorizes a verdict for plaintiffs on three grounds, namely:

(a) For depreciation in rental value of the residence during the five years preceding September 21, 1926, not exceeding $1000.

(b) For interference with plaintiffs' personal use and enjoyment of the home, as a result of smoke, fumes and refuse.

(c) *If* the Blue River is not a navigable stream, *then* for loss of profits from boating business.

(a) Plaintiff Marion Bollinger testified that he occupied the property until 1923 or 1924, and then moved away; that he was unable to rent it, and was obliged to pay caretakers $15 a week for two years; that the reasonable monthly rental was $35 a month. Elsewhere he testified that he tore down the club room "about four years ago," because he ordered the club away and they left, and he "didn't want the club-room there any more," and that the city condemned the rest of the building; that he is now rebuilding, and the present building has been built about two years. He stated that his caretakers complained of the odor of the smoke, prior to the erection of the stack; that the stack "remedied it some;" that "I might be able to live there now, after they put the stack up." The evidence does not anywhere indicate whether his inability to rent the premises to paying tenants arose in whole or in part, and if the latter, to what extent, from the conditions caused by defendants, or whether it was in whole or in part from other conditions, such as sewage in the river, or the unsafe condition of the building which brought about its condemnation, or its location in a manufacturing district close to four railroads, all of which conditions were in evidence. He merely stated that he had been unable to rent the property at all, though he had made strenuous efforts to do so. There is no testimony at all as to the value of the property.

As to the measure of damages for injury to real estate by a nuisance, the rule has been stated as follows:

"Where the injury to real estate is permanent, the measure of damages is the depreciation in the value of the property; and all

damages, both past and prospective, may be recovered. Where the injury is temporary or remediable, the measure of damages is not the depreciation of the value of the property, but the depreciation of the rental or usable value during the continuance of the injury; and damages as for a permanent injury cannot be allowed where the injury is temporary or the nuisance removable." [46 Corpus Juris, sec. 503, pp. 827-8.]

See also: Pinney v. Berry, 61 Mo. 359; Babb v. Curators of State University of Mo., 40 Mo. App. 173; Givens v. Van Studdiford, 86 Mo. 149.

(b) As to the second element of damages authorized by the instruction his testimony may be summarized in his own language:

"A. This company had a concern there for heating asphalt, or it looked as though it was gas distilled, and that had a corrugated iron stuck up like this (indicating) over it, and it was roofed over with corrugated iron, and it run without any stacks on and the smoke just fogged out all over everywhere; if the wind would come from the north, it would come in the house and almost strangle you to get your breath; you couldn't hardly exist there and after I moved from there they put a stack up; it remedied that some.

"Q. Why did you finally have to move and get away from that place and take your family away? A. Couldn't stand it.

"Q. Why couldn't you stand it? A. Why, the smoke would strangle you in the house; it would come in and fill the house full of smoke.

"Q. And you say they had no stack on that at all? A. No stack at all for perhaps two years.

"Q. And state whether or not, on account of the conditions created by this company there, you were obliged to move your family away from your home? A. Absolutely.

"Q. Were you able to live there after that at all? A. Well, I might be able to live there now, after they put the stack up, but I wasn't at that time."

His daughter testified:

"Q. What knowledge have you in regard to smoke or fumes coming from this factory on to your premises? A. Well, I used to have a room upstairs; I can show you on that picture there (indicating); when the wind blew in my direction it just blew that smoke and everything right in my window and I would almost have to keep the window closed to live in there.

"Q. To what extent would it get into your rooms there in your home? A. Well, it is heavy—I couldn't explain it, but it is kind of heavy like, you couldn't hardly—just like a heavy fog.

"Q. What effect would that have on your nostrils and tissues and lungs? A. Well, it hurt your lungs; you had to keep the windows closed or it hurt you worse."

There is no evidence as to any pecuniary loss occasioned directly or indirectly to plaintiffs under this item; nor is there anything shown which would furnish a yard-stick with which to measure the damages, if any.

We are cited to the case of McCracken v. Swift & Company (Mo. Sup.), 265 S. W. 91, and to the case of U. S. Smelting Company v. Sisam, 191 Fed. 302, as holding that damages for the disturbance of the home need not be susceptible of mathematical computation, but may be determined by the jury, whose decision, if reasonable, will not be disturbed. The McCracken case, quoting from Corpus Juris, says:

"The general rule is—that where the recovery is not a mere matter of computation it will not be interfered with, unless so excessive or so grossly inadequate as to be indicative of prejudice, passion, partiality, or corruption upon the part of the jury, or it appears to have been based upon an oversight or mistake or upon a consideration of elements not within the scope of the action. The court should merely consider whether the verdict is fair and reasonable and in the exercise of sound discretion, under all the circumstances of the case, and it will be so presumed, unless the verdict is so excessive or so outrageous, with reference to those circumstances, as to demonstrate that the jury have acted against the rules of law or have suffered their passions, prejudices, or preverse, disregard of justice to mislead them. [17 C. J. 1087.]"

In the McCracken case the amount awarded for loss in rental value was definitely fixed, leaving the balance as that for disturbance of the home (the amount being reduced by *remittitur* after verdict). In the Sisam case the petition asked a definite sum, $50, for the discomfort, sickness and inconvenience caused by the fumes objected to as a nuisance. In the case at bar neither the petition nor the instructions designated any specific amount as claimed or limited for this item (as it did for the item for depreciation of rental value). As we hold that the evidence as to rental value and loss of profits did not afford a proper basis for the verdict returned, and as the verdict was a general one for a single sum, we cannot tell how much of it was awarded for the item of disturbance of the home, and how much of it was for the other items mentioned.

(c) Damages for loss of profits are by the instruction made contingent upon a finding by the jury that the Blue River is not a navigable stream. The evidence as to such loss of profits is very indefinite. Plaintiff Marion Bollinger testified that there was no business at all to speak of in 1919, and not much above expenses in

1918, 1917 or 1916. He stated that he kept no books, but from recollection only he testified that 1920 was his last best year, in which he took in about $200 a week for the three summer months, and about $35 a week in April, May, September and October, but that he didn't think he made much above his expenses; that in 1921, 1922 and 1923 he took in about $150 a week, in 1924 $45, in 1925 "practically no business," and not much in 1926, up to the date of filing the suit. During all this time and at time of the trial he was employed by the city at $5.50 per day; that he did not keep his boating income and his city wages separate, but that he was sure he did not include the latter in the above statement; that it did include income from "boats, soda water, gasoline, oil, storage, everything complete," and "cigars, just everything that is sold in a soft drink stand." The items other than the "boating business" were not pleaded. Testimony as to these items was objected to at the time it was given, and the court orally ruled that "as an element of damage it will be stricken out." No evidence was introduced as to the portion of the total income which came from these sources so stricken out.

In Pryor v. Met. St. Ry. Co., 85 Mo. App. 368, this court said: "The word 'earnings' means the fruit or reward of labor; the price of services performed. Profits represent the net gain made from an investment or from the prosecution of some business after the payment of all expenses incurred. The net gain depends largely on other circumstances than the earning capacity of the person managing the business. The profits of a business with which one is connected cannot, therefore, be made use of as a measure of his earning power. Evidence showing that one has conducted a business with profit tends to show the possession of business qualities but it does not fix their value. It is the well-establish law that where one is injured in consequence of the negligent or wrongful act of another it is entirely competent for the former to show the loss of earning capacity in his business or occupation. But previous earnings must be restricted to those derived entirely from personal skill and services. Previous profits in business are not admissible in evidence in cases of this kind because of their speculative character."

See also York v. Everton, 121 Mo. App. 640, 97 S. W. 604.

Evidence as to profits since 1921 are indefinite, and the income prior thereto is too indefinite to constitute a basis of comparison to determine losses. There is no showing as to what part of his income had come from the rentals from the Kansas City Paddle & Camp Club, who used his club room, which he voluntarily discontinued "four years ago."

Plaintiffs' evidence on the question of loss of profits is too indefinite and uncertain to furnish a basis for a finding by the jury that is not entirely speculative and conjectural. This uncertainty

is accentuated by the fact that the damages shown or claimed for the period subsequent to September 30, 1921 (being the five-year period prior to the filing of the action) are not definitely separated from those prior thereto.

There was no instruction given or requested which required a finding of the damages from loss of profits separate from those for interference with plaintiffs' undisturbed use of their home. The authority to find damages for loss of profits was by the instruction made contingent on a finding that the Blue River was not a navigable stream. As the verdict was a general one for a lump sum, we are left in the dark as to whether the jury found that the river was not navigable, and included in their verdict an award for loss of profits, or whether they found it was in fact navigable and awarded no such damages. As we hold that the evidence was too general and uncertain to support a verdict for loss of profits this uncertainty as to whether or not they were included in the general verdict is a further ground for reversal.

We therefore hold that appellant's second assignment of error was well taken.

Appellant assigns that the court erred in not declaring as a matter of law that the Blue River is a navigable stream, and in giving plaintiffs' instruction No. 2, and in refusing to give defendant's offered instructions G and L, all on the subject of navigability.

Plaintiffs' given instruction 2 was as follows:

"The court instructs the jury that the term 'navigable stream' means such a stream as will permit and bear the passage of ordinary boats of commerce upon the bosom of its waters, and a stream to be navigable in law must be susceptible of being used in its ordinary condition, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water, and in determining whether or not the Blue River was a navigable stream at the time and place in the evidence and during the period referred to, the jury will apply the test and definition above set forth."

Defendant's refused instructions G and L were as follows:

### Instruction G.

"The court instructs the jury that the Blue River is a navigable stream and that the plaintiffs are not injured according to the evidence in a different manner than other members of the public, and your verdict must therefore be for the defendants and against the plaintiffs."

### Instruction L.

"The court instructs the jury that navigability does not depend on actual navigation, but on capacity for use and that it is not necessary that waters should be capable of commerce of pecuniary value

in order that they be navigable, as that term is used, but if the waters are adapted for use of public purposes, they are public or navigable waters.''

In the case of The Montello, 20 Wall. 430, l. c. 439, the United States Supreme Court said:

''Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And a river is a navigable water of the United States when it forms by itself, or by its connection with other waters, a continued highway over which commerce is, or may be, carried with other States or foreign countries in the customary modes in which such commerce is conducted by water.''

In U. S. v. Rio Grande Irrigation Co., 174 U. S. 690, l. c. 698, the court, by Mr. Justice BREWER, quoted the Montello case, and said:

''It is reasonable that the courts take judicial notice that certain rivers are navigable and others not, for these are matters of general knowledge. But it is not so clear that it can fairly be said, in respect to a river known to be navigable, that it is, or ought to be, a matter of common knowledge at what particular place between its mouth and its source navigability ceases. And so it may well be doubted whether the courts will take judicial notice of that fact. It would seem that such a matter was one requiring evidence, and to be determined by proof. . . . The mere fact that logs, poles and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river. . . . And again: 'It is not, however, as Chief Justice SHAW said, 21 Pickering 344, ''every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture.'' ' ''

In Cambest v. McComas Hydro-Electric Co., 245 S. W. 598, this court, speaking by TRIMBLE, P. J., cited the foregoing cases, and held that under the federal test the Platte River, in this State, is not a navigable stream.

And in Slovensky v. O'Reilly, 233 S. W. 478, the Supreme Court of this State, by GRAVES, J., said:

''In 27 R. C. L., p. 1302, it is said:

'' 'By the great weight of authority in this country, navigable waters are now defined as waters capable of being navigated; that is, navigable in fact. This definition is in accord with the civil law on the subject. In the words of the Digests, a navigable river is *statio iturve navigio*. The rule by which to determine whether waters are

navigable is variously stated, but clearly enough defined. The test of navigability of a river, as stated by the Supreme Court of the United States, is that those rivers are navigable in law when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. Another test is whether, in its ordinary state, a stream or body of water has capacity and suitability for the usual purpose of navigation, ascending or descending, by vessels such as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether steam or sail vessels.'

''There are cases which call rafting logs commerce upon the streams and broaden the view of the foregoing rule as to navigable streams. In Missouri, however, we have held to the more rigid rule, and with some aggressiveness.''

To similar effect is the case of State ex rel. Applegate v. Taylor, 224 Mo. 393, l. c. 485, 123 S. W. 892, in which it was stated:

''By the common law, a river is considered navigable only so far as the tide ebbs and flows into it. That is also the doctrine in several of the states, but not of this State. Here all streams which are actually capable of floating and of permitting the passage of ordinary boats upon the bosom of their waters are considered navigable rivers. [Hickey v. Hazard, 3 Mo. App. 480; O'Fallon v. Daggett, 4 Mo. 343.]''

See also, Grobe v. Energy Coal & Supply Co. (Mo. App.), 275 S. W. 67.

We hold that the question of whether the Blue River is a navigable stream is one of fact, and the court did not err in submitting it to the jury and in refusing defendant's offered instruction G, declaring as a matter of law that it is navigable.

Plaintiffs' given instruction No. 2 defining ''navigable stream,'' uses almost *verbatim* the language in the Montello case, supra, which in substance has been followed by the other decisions above cited; and the giving of it was not error.

Defendant's refused instruction L adds nothing to given instruction No. 2, but is merely an argumentative comment on one phase of it. Its refusal was not error.

Appellant assigns as error the refusal of the court to give its offered instruction D, reading as follows:

''The court instructs the jury that the nuisance complained of in this case, if any, is a public and not a private nuisance, and the plaintiffs are affected by it in a way differing only in degree and not in kind from the way the public in general are affected and therefore this suit cannot be maintained by an individual and your verdict must be in favor of the defendants and against the plaintiff.''

This instruction was a peremptory one to find for defendant on the grounds stated. It was properly refused. [Newman v. City of Marceline, 6 S. W. (2d) 659.]

Appellant also assigns as error the refusal to give its offered instruction N, as follows:

"The court instructs the jury that if you find and believe from the evidence that there were several or many factories or industrial plants operating in the general district in which the defendant operates which cast smoke and fumes into the air in such district, and if you find and believe from the evidence that it cannot be ascertained with a reasonable degree of certainty what part of the smoke and fumes passing over plaintiff's property, if any, came from the defendant's plant, and what part from other plants, if you find and believe there were other plants so casting smoke and fumes over and across plaintiff's property, then you should not find any damages in favor of plaintiff for smoke and fumes so cast, if any."

Plaintiffs' instruction No. 1 required a finding that the smoke and fumes came "from the plant of defendant and into the home of plaintiffs;" and instruction No. 3 on the measure of damages from smoke and fumes referred to that "coming upon his said premises from the plant of defendant." If there was enough of smoke and fumes definitely found to have come from defendant's plant to cause perceptible injury to plaintiffs, then the fact that another person or persons also joined in causing the injury would be no defense; and it was not necessary for the jury to find how much smoke and fumes came from each place. [U. S. Smelting Co. v. Sisam, 191 Fed. 302; Givens v. Van Studdiford, 86 Mo. 149, 56 Am. Rep. 421; Woodyear v. Schaefer, 57 Md. 1; 1 Wood on Nuisances, sec. 547.]

Appellant's last assignment of error is that the verdict was the result of passion and prejudice, and that the amount was excessive. We find nothing in the record indicating anything calculated to arouse passion or prejudice in the jury, nor the effect of any such.

We have held that the evidence on the question of depreciation in rental value and on that of loss of profits was too uncertain to support a verdict, and that the separate elements which went into the finding of the jury are not determinable in the verdict as it stands. If the verdict was based on the one element of disturbance of the home, we believe the verdict was excessive. Because of the uncertainty mentioned we cannot rule on this point.

For the errors mentioned the judgment should be reversed and the cause remanded.

*Barnett, C.,* concurs.

PER CURIAM:—The foregoing opinion by Lee, C., is approved and adopted as the opinion of the court. The judgment is accordingly reversed and the cause remanded. *Bland* and *Arnold, JJ.,* concur; *Trimble, P. J.,* absent.