**Garland GREGER and Bonnie Greger, Appellees,**

v.

**INTERNATIONAL JENSEN, INCORPORATED, a Delaware Corporation, Appellant.**

**No. 86–1858.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 15, 1987.

Decided June 5, 1987.

Rehearing Denied July 9, 1987.

Anthony J. Sestric, St. Louis, Mo., for appellant.

Milton B. Garber, Fulton, Mo., for appellees.

Before McMILLIAN, JOHN R. GIBSON and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

This case involves a company whose manufacturing process allegedly created a nuisance on plaintiffs' neighboring property. Because of errors during the trial, we are compelled to reverse and remand for a new trial.

## I. BACKGROUND.

On September 21, 1974, Garland and Bonnie Greger bought three-fourths of an acre of land in central Missouri near the Millersburg Exit of Interstate 70. At that time the building next door was an innocuous 1,400 square foot carpet warehouse. The Gregers began building a house on their new land. They planted trees, installed a sewer system and electric lines, and eventually a house began to take shape on the property.[1]

On September 24, 1975, when the house was nearly finished, the Discwasher Company[2] bought the land next door, on which stood the carpet warehouse. Discwasher makes phonograph record cleaners, which remove dust and particles from a record's surface. Discwasher converted the ware-

---

1. The Gregers lived in a mobile home on their property while building their house.

2. In January of 1981, Discwasher was bought by International Jensen, a subsidiary of Beatrice Foods, who carried on business as usual. For purposes of clarity, however, we will continue to refer to appellant as "Discwasher."

house to their purposes and began making record cleaning kits.

In early August of 1976, the Gregers moved into their new house, which they enjoyed for at least three dust-free years. The record is unclear as to when the Gregers first discovered that Discwasher was manufacturing more than just disc-cleaning equipment. The Gregers claim that they first discovered sawdust particles from the Discwasher plant on their property between 1979 and 1981. Because they were both working full time, however, the dust did not begin to bother them until 1984 to 1985, when they retired and began to spend more time at home. According to Discwasher, the Gregers first took action when their grandchildren, on a visit, noticed some brown dust in the new snow on their land.

In January of 1985, the Gregers complained to the Missouri Department of Natural Resources (Department), who sent Mr. Jim Wells, an environmental specialist, to collect samples of the offending dust from the Gregers' property. Laboratory analysis revealed the dust to be wood particles produced by mechanical operations.

The Department told Discwasher in March of 1985 to remedy the dust problem. Discwasher claims that this was their first notice of any dust problem, and that Mr. Greger told Mr. Michael Holt of Discwasher in April of 1985 that there was no urgency, and to take as much time as he needed to find a solution. Mr. Holt and Mr. Wells, working together, tried various methods to contain the dust but were unable to fix the problem until October of 1985, when Discwasher completely enclosed the sawdust bin collector area with a type of shed, so that a truck could be driven into the shed, the shed doors would then be closed, and the sawdust loaded into the truck. Mr. Holt saw and was satisfied with the solution during a test run in October of 1985.[3]

According to Discwasher, the problem was fixed in March, not October, of 1985. Discwasher stated that their business experienced a decline, and they stopped manu-facturing disc cleaners. Discwasher asserted that until October of 1985, when they resumed operations, the plant was only used to refinish some products that had been rejected by quality control officers. The Gregers protested, however, that during the summer of 1985, "strong and unpleasant lacquer odors wafted onto their property from the plant." The Gregers complained that despite the installation of the shed, they still saw dust flying onto their property and smelled lacquer.

The Gregers filed suit against Discwasher on May 28, 1985. A jury trial was held in May of 1986. The Gregers asserted that the dust and lacquer offenses had continued unabated up to the time of trial. A jury awarded the Gregers $25,000 actual damages and $75,000 punitive damages.

## II. DISCUSSION.

Discwasher asserts a number of grounds of error, one of which we find serious enough to merit remanding the case for a new trial. We hold that the district court erroneously measured the period of the nuisance under Missouri law. We also note that the court may have erroneously submitted the issue of punitive damages to the jury.

### A. Period of the Nuisance.

Discwasher argues that the district court erred in allowing evidence of damages up to the time of trial in May of 1986, rather than only up to the time the suit was filed in May of 1985. Discwasher argues that Missouri law allows damages to be recovered up to the time of trial only where an injunction is sought, either in lieu of or as well as damages, and that because only damages and no injunction was sought here, the measuring period was wrong.

The Gregers respond that Missouri has rejected the common-law rule in favor of the more modern approach, which allows damages up to the time of trial for suits in either law or equity. The Gregers also point out that Discwasher waived appeal of

---

3. Mr. Holt testified that the only complaint he received from the Gregers concerned dust, and that he never heard about a lacquer overspray or odor problem.

this issue by failing to object to the introduction of postfiling evidence at trial.

The Missouri law on this issue, although somewhat cryptic, is discernible. In a nuisance suit for damages alone, damages are limited to the injuries suffered at the time of the filing of the suit. Only when the suit seeks an injunction (equitable relief) as well as damages, are damages allowed to the time of trial. In *Thompson v. Hodge*, 348 S.W.2d 11, 15 (Mo.App.1961), the court stated: "In suits for damages because of nuisances, damages may be allowed for injuries suffered up to the time of commencement of suit, or, if the suit be in equity for injunction with damages as an incident, up to the time of trial, that is, for damages already sustained." (footnotes omitted). In *City of Harrisonville, Mo. v. W.S. Dickey Clay Mfg. Co.*, 61 F.2d 210, 213 (8th Cir.1932), a case dealing with a nuisance in Missouri, this court stated: "The ordinary rules as to the measure of damages apply in this case. Where, as here, both equitable relief by abatement and the recovery of damages are sought in the same action, damages sustained up to the time of the trial may be awarded."

In opposition, the Gregers cite *Fletcher v. City of Independence*, 708 S.W.2d 158, 178 (Mo.App.1986), which stated: "In [this type of] case the damages are measured by the reduction in the rental value of the property *during the continuance of the nuisance*—as well as other incidents of damage—such as loss of comfort and health." The Gregers acknowledge that in some jurisdictions damages in a suit of this type are limited to the time the suit was filed, but assert that Missouri has adopted the modern view, which states that "when there is a series of continuing harms the plaintiff * * * is permitted to recover damages only for harm to the use of the land *up to the time of trial.*" Restatement (Second) of Torts § 899 comment d, p. 443 (1977) (emphasis added).

We must therefore determine whether the *Fletcher* case overruled *Thompson* and

accepted the modern view as Missouri law. The case of *Bollinger v. American Asphalt Roof Corp.*, 224 Mo.App. 98, 19 S.W.2d 544 (1929) is instructive, as it encompasses both the seemingly contradictory *Fletcher* and *Thompson* cases.

In *Bollinger,* the proprietor of a pleasure boating business sued the owner of a roofing plant, alleging that the plant had polluted and ruined the stream, making it unusable for boating. The plaintiff won a verdict and defendant appealed, asserting that the trial court should have instructed the jury that the nuisance was permanent, not temporary. The court thus embarked on a discussion of temporary and permanent nuisances, stating the following:

> [W]here the nuisance is of a continuing (abatable) nature, [*i.e.,* a temporary nuisance] each continuance gives rise to a new cause of action, and successive actions may be maintained for the damages accruing from time to time * * * *although in such case the recovery is limited to damages for the statutory period preceding the commencement of the action.*

*Id.* 19 S.W.2d at 547, quoting *Hayes v. St. Louis & S.F.R.R. Co.,* 162 S.W. 266 (1913). The *Bollinger* court then determined that the nuisance was temporary, and the court's words are equally apt in this case:

> [I]t seems clear that the erection of defendant's plant for manufacturing purposes cannot be said to have been a nuisance per se, or such as in itself was notice or evidence that it would be operated and maintained in a way to constitute such a nuisance. There is nothing in the character of the structure which would in any way prevent it from being maintained indefinitely without offense to any one. The things complained of are due to the manner of its use.
>
> By their very nature the things involved in the manner of use of the plant are abatable, and the evidence shows that some of them in this case were in fact abated in part * * * .[4]

4. For a gloomy example of a structure which by its nature was a permanent nuisance, *see* Streett *v. Marshall,* 316 Mo. 698, 291 S.W. 494, 499

(1927), holding a funeral parlor located in a residential neighborhood to be a permanent nuisance. "No amount of skill or tact can whol-

*Id.* 19 S.W.2d at 547–48. The court then stated the passage found in *Fletcher* which the Gregers assert establishes the modern rule in Missouri:

> As to the measure of damages for injury to real estate by a nuisance, the rule has been stated as follows: "Where the injury to real estate is permanent, the measure of damages is the depreciation in the value of the property; and all damages, both past and prospective, may be recovered. Where the injury is temporary or remediable, the measure of damages is not the depreciation of the value of the property, but the depreciation of the rental or usable value during the continuance of the injury; and damages as for a permanent injury cannot be allowed where the injury is temporary or the nuisance removable."

*Id.* 19 S.W.2d at 549, quoting 46 Corpus Juris, § 503, pp. 827, 828.

■ Thus the phrase "during the continuance of the injury," or, in *Fletcher*, "during the continuance of the nuisance," is properly read as stating two points: First, where the nuisance is temporary or abatable, only damages already incurred, but not future damages, may be recovered, because the nuisance may abate in the future. Second, where the nuisance is temporary or abatable, the phrase "during the continuance of the nuisance" carries an implied portion so that it states in full: damages for a temporary nuisance, which under Missouri law is deemed to continue up to when the suit is filed, are recoverable during the continuance of the nuisance or injury, unless an injunction is also sought, in which case the nuisance or injury is deemed to continue up to the time of trial. We there-

fore hold that Missouri law adheres to the traditional view, and it was error to allow evidence of post-filing damages.

■ The Gregers correctly point out, however, that Discwasher failed to object as evidence was introduced pertaining to events happening after the suit was filed. They assert that "[f]ailure to object normally precludes consideration of, or at least weakens, the merits of the claim." *A.B. McMahan Co. v. Amphenol Corp.*, 443 F.2d 1072, 1077 (8th Cir.1971). Discwasher responds, however, that the district court ruled definitively on this issue during a pretrial conference, and thus there was no need to continue objecting. In this regard they cite *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112, 1118–19 (8th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986), which stated:

> In the instant case the district court made a definitive pre-trial ruling that affected the entire course of the trial. The district court's denial of the motion was not made conditionally or with the suggestion that the matter would be reconsidered. * * * Under these circumstances requiring an objection when [the witness testified] would have been in the nature of a formal exception and thus unnecessry under FED.R.CIV.P. 46.

Although this issue was not "fully briefed and argued" as it was in *Sprynczynatyk*, nonetheless the court was sufficiently clear and definitive as to the nature and scope of its ruling that the same considerations should apply. Both parties were well aware of the action the court planned to take.[5] As in *Sprynczynatyk*,

---

ly eliminate from the undertaking business its constant reminders of death, the one thing from which the normal individual instinctively flees, whatever his religion or philosophy of life."

**5.** The pretrial conference went as follows:

MR. SESTRIC: One thing we have, Judge, is this lawsuit was filed on May 28, 1985, and in overruling our motion for summary judgment the Court has described the case as one suitable for a temporary nuisance and under the law then they are limited to the date of the filing of the lawsuit to the end of their claim in this lawsuit which is May 28, 1985, so we

would ask the Court at this point to rule that—we're going to object if they testify as to anything happening after May 28, 1985, on the basis that's beyond the scope of this lawsuit.

MR. GARBER: I think the petition speaks as the date of trial.

MR. SESTRIC: Our case says as of the date of the filing of the lawsuit that that ends that claim and any claim for damages you have after that date is subject to a subsequent lawsuit.

MR. GARBER: It's as of the date of trial.

this was not a situation where a hypothetical question was posed whose nature and relevance was unclear before trial. Little purpose would have been served by repeatedly entering futile objections to the introduction of post-filing dust evidence.

Moreover, we note independent grounds supporting our consideration of this issue. If a party fails to object to the admission of evidence at the trial court level, any error is not preserved on appeal unless it is plain error. Plain error is "confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Berry v. Battey*, 666 F.2d 1183, 1187 (8th Cir. 1981).

█ Five months elapsed between the time the Gregers first noticed the nuisance and the time they filed suit, then another twelve months passed until the trial took place. Most of the Gregers' witnesses testified exclusively as to events happening after the suit was filed. In sum, under Missouri law, the majority of the testimony and other evidence in this case should not have been introduced. We are compelled to conclude that this error seriously affected the fairness of the trial.

### B. Punitive Damages.

Discwasher also argues that submitting punitive damages to the jury was improper. They argue that there was insufficient evidence to show that Discwasher acted in bad faith, primarily in view of their cooperation with the Department, and Mr. Greger's assurances that Discwasher could take their time in fixing the problems. The Gregers argue that the Department examined, and was satisfied with, only part of Discwasher's plant that was emitting dust, but that other aspects of the plant went uninspected by the Department and continued to cause problems. They argue that although Discwasher was well aware of these additional sources of dust and spray, they neglected to fix them, and wrongfully relied upon the Department's limited finding of compliance.

█ We think it inadvisable to reach this issue for a number of reasons. First, the retrial of this case will involve substantially more limited evidence of damages, pursuant to our earlier discussion. This has impact both on any award of actual damages and on any award of punitive damages. Second, we observe that the instruction given authorized the award of punitive damages for "willful, wanton and malicious" conduct and defined "malicious" as not meaning "hatred, spite or ill will as commonly understood, but means the doing of a wrongful act intentionally, without just cause or excuse." We observe that recent Missouri decisions have contained considerable discussion of "malice." *See Sanders v. Daniel International Corp.*, 682 S.W.2d 803, 807–08 (Mo. banc 1984); *Proctor v. Stevens Employment Services, Inc.*, 712 S.W.2d 684, 687 (Mo. banc 1986); *Overman v. Southwestern Bell Telephone Co.*, 706 S.W.2d 244, 248–49 (Mo.App.1986). Analysis of the evidence to determine whether there is a submissible issue of punitive damages will first require a determination under these Missouri cases as to what standard of malice applies in this action for nuisance. We believe this question of Missouri law should be first decided by the district court, following which it should determine whether there was sufficient evidence to meet this standard. Accordingly, the issue of punitive damages, as well as actual damages, is remanded for retrial.

### III. OTHER CONTENTIONS.

Although not essential to our ruling, we will address the parties' remaining contentions to avoid needless discord in any future proceedings.

█ Discwasher argues that Mrs. Greger was improperly allowed to read to the jury portions of her diary relating to annoyances from the plant. To the extent

THE COURT: Yeah, I'm going to let them put on evidence of everything up to the date of trial. Now, you know, then if it continues then you'll have to put on—then you'll have to file a new lawsuit. I'll let you put on evidence of everything up to the date of trial and damages up to the day of trial.

Mrs. Greger's diary reflects events happening after the filing of the suit, such evidence should have been excluded. To the extent her diary reflects events happening up to the time suit was filed, however, reading the diary was proper.

 Discwasher argues that allowing a witness to read a statement into the record is error, citing cases condemning the practice. The Gregers correctly point out, however, that the diary was read not to refresh Mrs. Greger's present recollection, which is covered by Fed.R.Evid. 612, but rather, was introduced as a past recollection recorded, covered by Fed.R.Evid. 803(5). In *Goings v. United States*, 377 F.2d 753, 759–60 (8th Cir.1967), the court clarified the distinction as follows: "Refreshing a witness's recollection by memorandum or prior testimony is perfectly proper trial procedure * * *. However, if a party can offer a previously given statement to substitute for a witness's testimony under the guise of 'refreshing recollection,' the whole adversary system of trial must be revised." The court then cautioned that:

> The use of an exhibit as "past recollection recorded" where the witness swears that his written recital of facts is true, is not to be confused. Justification for the admissibility of such an exhibit is safeguarded by the requirements that (1) the witness acknowledge the document as accurate, and (2) that it be prepared "contemporaneously" with the events.

*Id.* at 760, n. 8.

Mrs. Greger testified that she and Mr. Greger wrote the diary, that they made correct entries at the time the noted events occurred, and that she could not recall and testify to the events in the diary from memory. Accordingly, reading the diary regarding events happening up to the filing of the lawsuit was permissible under Fed.R.Evid. 803(5).

Discwasher asserts a number of other flaws on the record; namely, that their evidence as to state of mind was improperly excluded, their net worth was improperly stated, that trial testimony went beyond the scope of the pleadings, that the jury was required to speculate, that the amount of the verdict and judgment was contrary to law, that the jury instructions were erroneous, that the court should have dismissed the Gregers' complaint, and that Discwasher's summary judgment motion, and other trial and post-trial motions, should have been granted. After examining these assertions, we conclude that the district court was well within its discretion as to them, and accordingly, find them to be without merit.