MAUD M. STREET ET AL. v. MERRITT H. MARSHALL, JR., ET AL. Appellants.—291 S. W. 494.

Court en Banc, February 15, 1927.

1. **RESIDENTIAL DISTRICTS.** The evidence in this case clearly establishes that defendants' funeral home is located in a residential neighborhood.

2. **NUISANCE: Fanciful Injury: Trifling Annoyance.** A fanciful or imaginary injury, resulting in trifling annoyances, inconveniences and discomforts to persons of too sensitive a nature or fastidious tastes, does not constitute the use of property a nuisance. But if the use when applied to normal persons—those of ordinary habits and ordinary sensibilities—produces positive discomforts and injury, though caused by a lawful and useful business, it does constitute a nuisance.

3. ————: **Tests: Funeral Home: Injunctive Relief.** In final analysis the tests for injunctive relief from the use of property in a residential neighborhood as a funeral home are: Do the activities connected with it produce constant remainders of death and impair in a substantial way the comfort, repose and enjoyment of the homes in the neighborhood? The immediate presence of those mute reminders of death—the chapel, the coming and going of the hearse, the knowledge that within a few feet of dwelling houses, where families sleep and eat and maintain their home life, dead bodies are being taken in and carried out, that sorrowing kindred and friends are viewing them, that funerals are being held and that processions of mourners are coming and going—has a depressing effect upon the minds of normal persons, weakening their physical resistance, and lessens the value of such neighboring dwellings for residential purposes, and grievously impinges upon the rights of their owners to the undisturbed enjoyment of their homes, and constitutes a nuisance, authorizing injunctive relief.

4. ————: **Funeral Home: Reception of Embalmed Bodies.** In a residential neighborhood defendants fitted up their residence for a funeral home, and twenty-four owners of residences in the neighborhood bring suit to enjoin such use. The funeral home is not in full sense an undertaking establishment. More accurately it is a mortuary chapel; a place devoted to the reception of the dead and the performance of funeral rites. No contagion or noxious odors or offensive gases emanate from it. Dead bodies are embalmed elsewhere, fully prepared for burial and put in caskets and brought to the funeral home and placed in one of its parlors, and there viewed, or may be viewed, by kindred and friends from time to time, until in due course a funeral service is held and the body removed for burial. The bodies are brought into and taken from the building on the side street, and the hearse is always brought around to that side, but people who attend the funeral services or come to view the bodies enter by the side doors or pass through the front door indiscriminately, and the building fronts on a boulevard purely residential, and their automobiles are parked on both sides of the boulevard. The bodies remain in the parlors from a few hours to two or three days, the time depending on a variety of circumstances. Held, that the maxim, Sic utere tuo ut alienum non laedas, applies, and the coming and going of the hearse, the procession of friends and kindred in viewing the bodies, and the funerals held at recurring intervals are constant reminders of death, and such use of the property grievously impinges upon the

rights of plaintiffs to the undisturbed enjoyment of their homes, and should be enjoined.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 3057, p. 1068, n. 22. **Nuisances,** 29 Cyc., p. 1183, n. 44; **Appeal and Error,** 4 C. J., Section 3057, p. 1068, n. 22. **Nuisances,** 29 Cyc., p. 1183, n. 44; p. 1247, n. 48.

Appeal from Circuit Court of City of St. Louis.—*Hon. A. B. Frey,* Judge.

AFFIRMED.

*Abbott, Fauntleroy, Cullen & Edwards* and *C. M. Hay* for appellants.

(1) An undertaking establishment is not a nuisance *per se,* and its location in a residential district will not be enjoined merely on the ground of depreciation of property in the neighborhood resulting from the proximity of such an establishment, or because of its depressing mental influence, or offense to taste or fancy. 23 A. L. R. 745 and notes. (2) That mere depreciation in the value of adjoining property because of the alleged threatened nuisance is not of itself sufficient to justify an injunction is a well-established rule. Van De Vere v. Kansas City, 107 Mo. 83; Dean v. Powell Undertaking Co., 203 Pac. 1015; Cook v. Fall River, 239 Mass. 90; Shamburger v. Scheurrer, 198 S. W. 1069; Haynes v. Hedrick, 223 S. W. 550; Worm v. Wood, 223 S. W. 1016; Von Hatzfeld v. Neece. 223 S. W. 1034; Miller v. Dickinson, 236 S. W. 1014. (3) If the complainant's right is doubtful, or the thing which it is sought to restrain is not a nuisance *per se* and will not necessarily become a nuisance, but may or may not become such, depending on the use, manner of operation or other circumstances, equity will not interfere. McHan v. McMurry, 173 Ala. 182; McDaniel v. Cemetery Co., 246 S. W. 874; Dean v. Powell Undertaking Co., 203 Pac. 1015; Joseph v. Wieland Dairy Co., 297 Ill. 574; Julian v. Oil Co., 112 Kan. 671; State ex rel. Stewart v. Cozad, 113 Kan. 200; Baltimore v. Sackett, 135 Md. 56; Cook v. Fall River, 239 Mass. 90; Lansing v. Eaton, 214 Mich. 117; Lansing v. Perry, 216 Mich. 23; Snyder v. Hylan, 173 N. Y. Supp. 366; Texas Co. v. Brandt, 191 Pac. 166; Ayars v. Wyoming Valley Hospital, 274 Pa. 309; Wergin v. Voss, 192 N. W. 51; Wasilewski v. Biedrzycki, 192 N. W. 989. (4) The rule that a court of equity will not interfere with the threatened nuisance is not inevitable, but only contingent, depending on the manner of operation, use or other future circumstances, has been applied in a number of cases involving slaughterhouses, stock pens and dairies.

Richmond v. House, 177 Ky. 814; Beckham v. Brown, 19 Ky. L. Rep. 519; McDonough v. Robbens, 60 Mo. App. 156.

*Douglas W. Robert* for respondents.

(1) An undertaking establishment, located in a first class residence district, is a private nuisance and its operation will be enjoined by the courts. Tureman v. Ketterlin, 304 Mo. 221; Pierce v. Union Trust Co., 278 S. W. 398; Deevers v. Lando, 285 S. W. 748; McNulty v. Miller, 167 Mo. App. 136; Blackford v. Const. Co., 132 Mo. App. 163; Marble Co. v. Gaslight Co., 128 Mo. App. 109; Bielman v. Ry. Co., 50 Mo. App. 151; Saiger v. Joy, 198 Mich. 295; Densmore v. Evergreen Camp, 61 Wash. 230; Beisel v. Crosby, 104 Neb. 644; Meagher v. Kessler, 147 Minn. 182; St. Paul v. Kessler, 146 Minn. 124; Osborn v. Shreveport, 143 La. 932; Goodrich v. Starrett, 108 Wash. 437; Cunningham v. Miller, 178 Wis. 22; Roland v. Miller, 139 N. Y. 93; Barnes v. Haythorne, 54 Me. 124; Ross v. Butler, 19 N. J. Eq. 294; Cleveland v. Gas Co., 20 N. J. Eq. 209. (2) Testimony that witnesses saw others ''depressed'' as a result of the undertaking establishment, and were themselves ''depressed,'' is competent and proper. Eyerman v. Sheehan, 52 Mo. 225; Fletcher v. K. C. Rys., 221 S. W. 1070; Elliott v. Ry. Co., 157 Mo. App. 517; Kirchof v. Ry. Co., 155 Mo. App. 70; Fulton v. Ry. Co., 125 Mo. App. 239.

RAGLAND, J.—This is an action to perpetually enjoin the defendants from using their premises, known as 5297 Washington Boulevard, in the City of St. Louis, as a ''funeral home.''

The block in which the premises in question are located is bounded on the north by Delmar Avenue, on the east by Lake avenue, on the south by Washington Boulevard and on the west by Union Boulevard. As indicated by these boundaries Lake Avenue and Union Boulevard run north and south; they are parallel streets, a block apart, and extend from Delmar Avenue on the north to Forest Park on the south. The east-and-west thoroughfares connecting the streets last named, between Washington Boulevard on the north and Forest Park on the south, are as follows: Westminster Place, Waterman Avenue, Portland Place, Westmoreland Place and Lindell Avenue. All of the territory lying between Lake Avenue and Union Boulevard, from Washington Boulevard to Forest Park, comprises an exclusive residential district. Westmoreland Place and Portland Place, according to the trial court, are ''two of the finest and most beautiful residential streets in this country.'' Delmar Avenue between Lake Avenue and Union Boulevard is a business street and is traversed by a double-track line of street railway. Union Boulevard from

Delmar Avenue to Forest Park is a residence street. There are some stores on the east side at Delmar and again on the west side where Pershing Avenue comes into Union Boulevard from the west, a block or two south of Delmar. On further south there are on the west side a family hotel and a church; otherwise, both sides of the street are occupied by residences.

The dimensions of the block first described on the Union Boulevard side is 336 feet; on the Lake Avenue side it is somewhat narrower. It is crossed east-and-west by a fifteen-foot alley on lines which are approximately equi-distant from Delmar Avenue and Union Boulevard. A lot fifty feet in width adjoining the east line of Union Boulevard, fronting south on Washington Boulevard and extending back north to the alley just described, is the *locus in quo.* On this lot there is a three-story brick structure; it was built for a family residence and was occupied as such for many years and until acquired by defendants a short time before the commencement of this action.

Washington Boulevard is seventy feet in width; its length between Lake Avenue and Union Boulevard is approximately 1,000 feet. On both sides of this portion of the street are residences which are located on lots having a frontage of from 40 to 141 feet and which cost originally from $15,000 to $20,000. All of these houses, except the one which is the subject of this controversy, are occupied by their owners as family residences. These houses when built were in a "restricted" district. Shortly after the restrictions expired, on September 21, 1923, the defendants, who had been engaged in the undertaking business in St. Louis for a number of years, bought the property heretofore described and announced that they would conduct a "funeral home" there.

The residence which the defendants have converted into a "funeral home" fronts on Washington Boulevard, and it has a large porch extending across the entire front. After the defendants purchased the property they constructed a small porch on the Union Boulevard side of the house, toward the rear, and replaced two windows with doors. From this side porch defendants' business office can be entered through one of the doors, and one of the three parlors on the first floor can be entered through the other. Aside from the alterations just described the external appearance of the building has not been changed. On the inside, however, the entire lower floor has been suitably arranged, furnished and draped for the uses required by defendants' business. Defendants themselves, who are husband and wife, occupy the second floor as living quarters. They house in a garage in the rear a white ambulance which they use in conveying dead bodies from one place to another as occasion requires; and during the day when the ambulance is not in use they permit

it to stand near the premises in Union Boulevard. They keep in the house embalming fluids, a cooling board and pedestals, catafalques and certain other funeral paraphernalia.

Defendants' practices as undertakers, as bearing on the use they make of the premises in question, seem to be these: When called they proceed with the ambulance, cooling board and embalming fluids to where the death occurred, take charge of the body and convey it to 429 North Euclid Avenue in St. Louis, where they embalm·it or have it embalmed. After the body is embalmed, fully prepared for burial and put into a casket, it is brought by the defendants to their "funeral home" and placed in one of their parlors. It is there viewed, or may be viewed, from time to time by relatives and friends until in due course a funeral service is held and the body removed for burial. Occasionally bodies prepared for burial by defendants which are to be shipped away from St. Louis are laid out in one of their parlors to enable kindred and friends to come and pay their last tributes to the memories of the departed. Defendants also receive and convey to their funeral parlors for funeral rites, or that they may be viewed, bodies which are shipped to St. Louis for burial in a local cemetery. The length of time during which any one body is kept on defendants' premises for any of the purposes above mentioned varies from a few hours to two or three days, depending upon a variety of circumstances. The funeral services held in defendants' parlors are of the usual character, lasting from thirty minutes to an hour. The bodies are always brought·into and taken from the building on the Union Boulevard side, and the hearse is always brought around to that side and parked in Union Boulevard during the funeral services. But the people who come to attend these services enter the building through both the side door and the front door indiscriminately, and they park their automobiles on both sides of Washington Boulevard, as well as in Union Boulevard. Many, perhaps the majority, of the funerals conducted by defendants as undertakers are at the homes where the deaths occur. Those held at their "funeral home" between the time they opened the place and the trial of this cause, a period of a little over six months, averaged one a month. How many bodies were brought there with respect to which no funeral services were held does not appear.

On the trial defendants testified that it was not their purpose to do any embalming at their premises at 5297 Washington Boulevard; that they would bring there only·bodies which had been previously embalmed; and that dead bodies when properly embalmed do not give off odors.

The plaintiffs, twenty-four in number, are the several owners and occupants of homes located on both sides of Washington Boulevard, between Lake Avenue and Union Boulevard, and at distances from

defendants "funeral home" which range from fifteen feet to five hundred feet. Ten or twelve of them testified as witnesses. In describing the way in which he was affected personally by the proximity of his home to the "funeral home," with its constant reminders of death, one of them said: "I don't say that it has affected my health, but I am not very cheerful about going by there or any other undertaking establishment. I don't like to see the dead, and I don't like to be in the presence of the dead." Another said that he experienced "only a feeling of uneasiness or a feeling of depression—that sort of a feeling one has when he comes close to death or an operation—a feeling that you would not seek and would try to keep away from and try to keep out of your mind." They all said that the maintenance and operation of the "funeral home" in their midst brought sadness and depression to them and the members of their families, and that such depression, in certain designated individual cases, had been accompanied with extreme nervousness. None, however, was able to say that his or her health had been directly affected. Plaintiffs also called a number of physicians who testified, in substance, that such an undertaking establishment as that conducted by defendants would have a decidedly depressing effect upon the nervous system of persons of nervous temperament, particularly women and children, who lived in its immediate vicinity, and that such depression would be deleterious to health. We quote briefly from two of them.

Dr. Lister Tuholske: "I am saying that a constant reminder that people are dying every day or every few days, to people of nervous temperament, has a depressing effect. Q. Would such a depressing effect be deleterious or beneficial to the health of a person? A. It would be deleterious."

Dr. Floyd Stewart: "That (the effect on persons living near defendants' funeral home) would depend entirely upon the person's ability to withstand the conditions that confront them. Some persons are more sensitive than others, and those very sensitive persons, like women and children, it would have a very depressing effect upon, while some hard-boiled men it would have little or none upon, but ninety per cent of the people would be very much depressed."

Plaintiffs further offered an abundance of expert testimony, practically uncontradicted, tending to show that the continuance of the "funeral home" would depreciate the values of their property from forty to fifty per cent.

Defendants' evidence tended to show that an undertaking establishment and its activities do not in any respect affect adversely the health of the average normal individual who lives near it; that no sickly zones surround undertaking shops; that from time immemorial men and women have lived within their immediate environ-

ment, and lived in the vigor of health, even joyously, until the full measure of life's span had been accomplished. Nor did defendants' experts agree with those who testified for plaintiffs. One of them was of the opinion that the living observer of a passing funeral would, or might, be buoyed up by the thought that another, and not he, was on the way to the cemetery. Another was of the opinion that a person suffering from nervousness or depression might be benefited by being stationed at some point of vantage where he could view passing funeral processions.

The evidence on the part of defendants further disclosed that in the same block in which their "funeral home" is located there are two other undertaking establishments—on Delmar Avenue; and that there is a third one across the street on Delmar.

The trial court held in effect that defendants' "funeral home," because of its location in a strictly residential district, constituted a nuisance and enjoined its further maintenance at that place.

There are two assignments of error: (1) The granting of the injunction, and (2) the admission of improper evidence for plaintiffs. Under the second no specific ruling of the trial court is pointed out and no question relating to the admission of evidence is briefed. We shall therefore treat that assignment as abandoned. With respect to the granting of the injunction, appellants' contentions are two: (1) That defendants' "funeral home" is not located in a residential neighborhood; and (2) that, even though it be located in such a neighborhood, plaintiffs have failed "to show any substantial injury to health, diminished resistance to disease, noxious odors or gases, or the maintenance of a morgue in connection therewith." The first of these contentions is, under the evidence, wholly untenable; the second merits careful consideration.

In Tureman v. Ketterlin, 304 Mo. 221, Division One of this court, following the current of authority, held that an undertaking establishment located in a strictly residential district, because of such location without more, constituted a nuisance. The facts in that case, however, differ from those in this. The undertaking establishment there dealt with was one at which not only were funerals held, but dead bodies were washed and embalmed and otherwise prepared for burial. Appellants' "funeral home" is not an undertaking establishment in the full sense of those terms. It can be more accurately characterized as a mortuary chapel; a place devoted to the reception of the dead and the performance of funeral rites. No contagion and no noxious odors or offensive gases emanate from the place. But the dead are taken there and laid out to be viewed by sorrowing kindred and friends who from time to time come and go; and funerals are held there at recurring intervals and with them comes the hearse carrying the dead, followed by processions of mourners.

These constant reminders of death are the things complained of in this case; the mortuary itself and the visible activities which take place in connection with it. Respondents say that the immediateness, both as to time and place, with which they suggest death keep them and their families living, in a very real sense, in the constant presence of the dead, whereby they are greatly saddened and depressed.

Buttressed by the testimony of their experts as well as the results of every day experience and observation, as they conceive them, appellants insist that the ills of which respondents complain are simply fanciful or imaginary; that the worry and uneasiness which they do manifest grow out of the fear that their property may suffer some depreciation.

At this point it may be of advantage to advert to the legal principles in the light of which the respective contentions of the parties must be resolved. They find an adequate statement in the following quotations, one from a standard text and the other from a leading case:

"It is well settled that the injury (resulting from the use of a property which is alleged to constitute a nuisance) must not be fanciful or imaginary; nor such as to result in a trifling annoyance, inconvenience or discomfort, which may affect those who possess too sensitive a nature or too fastidious a taste. The law is applied only to the normal man—the man of ordinary habits and ordinary sensibilities—it does not take cognizance of insensible and insubstantial discomforts and inconveniences:" [20 R. C. L. 382.]

"The law takes care that lawful and useful business shall not be put a stop to on account of every trifling or imaginary annoyance, such as may offend the taste or disturb the nerves of a fastidious or over-refined person. But, on the other hand, it does not allow any one, whatever his circumstances or conditions may be, to be driven from his home, or to be compelled to live in it in positive discomfort, although caused by a lawful and useful business carried on in his vicinity. The maxim, *sic utere tuo ut alienum non laedas*, expresses the well established doctrine of the law." [Ross v. Butler, 19 N. J. Eq. 294.]

In view of these principles appellants argue that an undertaking establishment where only bodies have been embalmed are received, thus eliminating all questions of communicating disease or fouling the air with noxious or offensive odors and gases, cannot be held to be a nuisance, although conducted in an exclusively residential neighborhood. In other words, in order for such an establishment to constitute a nuisance its character must be such as to directly affect the health or grossly offend the physical senses. This position is without support in the decided cases. While it is true that in many,

316 Mo.—45.

if not all of them, the charge was made that the establishment complained of would communicate contagion and would emit noxious gases and offensive smells, such charge was almost universally found to be without substantial support in the evidence. A careful reading of the cases will. disclose that what has been stressed and in the last analysis made the basis of injunctive relief is this: *constant reminders of death,* such as an undertaking establishment and the activities connected with it give rise to, *impair in a substantial way the comfort, repose and enjoyment of the homes* which are subjected to them. [Tureman v. Ketterlin, supra; Saier v. Joy, 198 Mich. 295; Densmore v. Evergreen Camp, 61 Wash. 230; Osborn v. Shreveport, 143 La. 931; City of St. Paul v. Kessler, 146 Minn. 124; Meagher v. Kessler, 147 Minn. 182; Goodrich v. Starrett, 108 Wash. 437; Beisel v. Crosby, 104 Nebr. 643; Rowland v. Miller, 139 N. Y. 93; Cunningham v. Miller, 178 Wis. 22.] In this connection we cannot forbear from again quoting from Saier v. Joy, supra, a well considered case decided by the Supreme Court of Michigan:

"We think it requires no deep research in psychology to reach the conclusion that a constant reminder of death has a depressing influence upon the normal person. Cheerful surroundings are conducive to recovery for one suffering from disease, and cheerful surroundings are conducive to the maintenance of vigorous health in the normal person. Mental depression, horror and dread lower the vitality, rendering one more susceptible to disease, and reduce the power of resistance. There is an abundance of testimony in this record confirmatory of this, and it is a matter of common knowledge. The constant going and coming of the hearse; the not infrequent taking in and out of dead bodies; the occasional funeral with its mourners and funeral airs, held in the part of the house designed for a chapel; the unknown dead in the morgue, and the visits of relatives seeking to identify them; the thought of autopsies, of embalming; the dread, or horror, or thought, that the dead are or may be lying in the house next door, a morgue; the dread of communicable disease, not well founded, as we have seen, but nevertheless present in the mind of the normal layman—all of these are conducive to depression of the normal person; each of these is a constant reminder of mortality. These constant reminders, this depression of mind, deprive the home of that comfort and repose to which its owner is entitled."

And from Densmore v. Evergreen Camp, supra, a pioneer case decided by the Supreme Court of Washington:

"For in this age, when population is becoming more and more congested in the cities, it would be manifestly unfair to grant injunctive relief only in those cases where the object attacked was a nuisance *per se,* when other circumstances or conditions intervene which might tend to destroy the repose and comfort of a part of a city or

town given over to homes. In this case, as in that, the element of comfort and repose in the enjoyment of the home becomes an essential element of our inquiry. For it is not only shown by the evidence, but it may be accepted as within the common knowledge of man, that the immediate presence of those mute reminders of mortality, the hearse, the chapel, the taking in and carrying out of bodies, the knowledge that within a few feet of the windows of one's dwelling house where the family sleep and eat and spend their leisure hours, autopsies are going on, that the dead are there, cannot help but have a depressing effect upon the mind of the average person, weakening, as the testimony shows, his physical resistance, and rendering him more susceptible to contagion and disease.''

In summarizing its conclusions with respect to the disturbing effect of an undertaking establishment on home life when carried on in a residential neighborhood, the Supreme Court of Louisiana in Osborn v. Shreveport, supra, said:

''We find no reason to doubt that plaintiff conducts his business after the most approved methods and with as little offense to those by whom he may be surrounded as the business will admit; but, to the incidents mentioned, there is to be added the fact that the business itself is a gruesome one, and that the psychological influence of being confronted, and having one's family confronted, day after day and at all hours of the day, with death, and its woeful trappings in the shape of hearses and other vehicles, carrying in and out of a neighboring building the mortal remains of some fellow being, is no more enlivening nor wholesome than would be the constant presence of the same corpse, or the immediate proximity of a grave yard; and we take judicial notice that the introduction of such business into a residential neighborhood, where none has previously been established, will inevitably depreciate the value of the property as well as discommode the owners. The case is therefore one in which the maxim, 'Sic utere tuo,' etc., is particularly applicable, and if the city of Shreveport had no power to enforce that maxim and protect its citizens in the peace and quiet of their homes, they would be entitled to much sympathy.''

With reference to a ''funeral home,'' such as the one involved in this case, the Supreme Court of Minnesota in St. Paul v. Kessler, supra, said:

''We agree with the courts above mentioned that the ordinary normal person cannot live next door to an undertaking establishment or funeral home, where dead bodies are continuously carried in and out and are kept for longer or shorter periods, without thereby being more or less deprived of the comfortable enjoyment of his home. The business, then, is such that it may be regarded as a private nuisance in residence districts.''

· In a later case, dealing also with a "funeral home" the same court in Meagher v. Kessler said:

"The general principles involved in these cases fully justify the conclusions arrived at by the learned trial court in the case at bar. The feelings and sentiments of the respondents are those of the ordinary, normal individual living under similar conditions, that is, being compelled, by day and night, to look out from their homes upon an institution devoted solely to the carrying in and out of dead bodies, and the conducting of obsequies. It is the most universal rule that an undertaking business is not a nuisance *per se,* but, as generally held, the ordinary person can hardly live next door to such an establishment without becoming depressed and more or less deprived of the comfort and enjoyment of his surroundings and when long continued it is liable to affect his general health.

"We conclude that the rule must be considered as well settled, that when the prosecution of a business, of itself lawful, in a strictly residential district, impairs the enjoyment of homes in the neighborhood, and infringes upon the well being and comfort of the ordinary, normal individual residing therein, the carrying on of such business, in such locality, becomes a nuisance and may be enjoined."

The Supreme Court of Nebraska in holding that the maintenance of a "funeral home" in a residential district might be enjoined, in Beisel v. Crosby, supra, concluded its opinion as follows:

"Though defendant was not prompted by malice or by any evil design, and meant only to exercise the privileges of citizenship, he failed to show proper respect for the property rights and the personal feelings of plaintiffs when he opened his undertaking establishment in their midst. He was in the wrong when he encroached on the repose, the comfort, and the freedom of their homes, depreciated the value of their property, depressed their spirits, and weakened their power to resist disease. His business was not a necessity at the place selected by him. He equipped his funeral home at his peril, after he had been warned by plaintiffs of their objections. Under all the circumstances the injunction was properly allowed."

In some of the cases quoted from there was a city ordinance prohibiting the conduct or maintenance of an undertaking establishment or "funeral home" within a residential district, but in those cases the validity of the ordinance was made to rest upon the ground that such a business when carried on in a strictly residential district constituted a private nuisance which it was within the competence of the municipality to abate in the exercise of the police power. The holdings in the cases cited, when carried to their logical conclusions, are to the effect that the conduct or maintenance of an undertaking establishment or "funeral home" in a strictly residential district constitutes a nuisance as a matter of law. But it is not necessary to go

so far in the instant case. The evidence fully warranted the chancellor's finding that the use which the defendants are making of their property grievously impinges upon the rights of plaintiffs to the undisturbed enjoyment of their homes. No amount of skill or tact can wholly eliminate from the undertaking business its constant reminders of death, the one thing from which the normal individual instinctively flees, whatever his religion or philosophy of life. To be compelled to live in a continuing atmosphere of death is intolerable. While the undertaking business is not only lawful but indispensable, there is no justification or excuse for its seeking out and establishing itself in localities devoted exclusively to homes, where it not only materially detracts from the comfort and happiness of those who dwell there but ruinously depreciates the values of their real estate as well.

The judgment of the circuit court is affirmed. All concur, except *Gantt, J.,* not sitting, and *Graves, J.,* absent.