No. 28,755.

A. R. Hatcher, J. M. Thralls, George Morton, Mary Brockman, M. E. Mason, Bessie M. Burnett, Ella Camp, Hattie Scarborough, J. W. Rutherford, B. A. Bussard and Mary E. Maddy, *Appellees*, v. Roy Hitchcock, *Appellant*.

(281 Pac. 869.)

Opinion filed November 9, 1929.

*A. M. Ebright, J. B. Patterson, Allen B. Burch, P. K. Smith*, all of Wichita, and *Wendell Ready*, of Wellington, for the appellant.

*H. W. Goodwin*, of Wellington, for the appellees.

The opinion of the court was delivered by

Dawson, J.: This was an action to enjoin the establishment of an undertaking business and funeral home in the vicinity of plaintiffs' residences in Wellington. One of the plaintiffs, Doctor Hatcher, a physician, had a private hospital as well as his private residence in close proximity.

Plaintiffs' petition recited the pertinent facts and prayed that defendant's threatened establishment be declared a nuisance and enjoined as such.

Defendant's answer admitted that he had purchased property adjacent to that of some of the plaintiffs and that his purpose was to remodel it into a funeral home, but he denied that it was or would be a nuisance to plaintiffs or would depreciate the value of their property. Defendant also denied that the locality where he proposed to establish the funeral home was exclusively a residential district.

He also pleaded that the principal business district some three or four blocks to the south is gradually growing in that direction; that immediately across the street is the county courthouse and jail, and in the block south of the courthouse there is a law office, two filling stations, a funeral home, and the office of an osteopath. Defendant further pleaded that prior to the institution of this action he had secured a building permit under a pertinent city ordinance authorizing him to remodel the property for the use of a funeral home. It was also alleged that defendant proposed to use all the best modern standards in the construction and maintenance of the proposed establishment and to employ only licensed embalmers and funeral directors and to conduct the business in strict accord with the statutes and the rules of the state board of health. The answer also set up the pertinent city ordinance which declared it to be unlawful to keep "any livery stable, dairy, undertaking establishment, morgue or dead house" on any residence street; and this ordinance defined a residence street as one where not less than 75 per cent of the frontage on both sides of the street was used or sold for residential purposes.

On the issues joined the cause was heard at length. No material dispute of fact was developed by the evidence. Photographs used at the trial are reproduced for our inspection. They show that the east front of the block facing the courthouse is occupied by substantial residences except on the southeast corner, where Doctor Hatcher's hospital is located. It is a substantial three-story structure. The houses, shade trees, sidewalk, parking and paving thereabout are typical of the better-class residential sections of any thriving county-seat town. It is one of these residences about the middle of the block which defendant threatens to remodel into an undertaking establishment.

The defendant, in part, testified:

"Q. This business will be conducted in the same manner? A. Yes; and in a more efficient manner.

"Q. . . . You will handle about the same class and character of business you have always handled? A. Yes, sir. . . .

"Q. Did you handle the Charley Covell body they got out of that shop? A. Yes, sir. . . .

"Q. What was done with the body? A. That was put in an old hearse; it was not fit to be shown to the public, not fit to be taken into the undertaking establishment; I took them up to the garage, invited the doctors and coroner there; there was a big crowd of curiosity seekers; it is our business to protect people; they held the examination in my garage.

"Q. Did you clean the remains any up there? A. Did the best we could.

"Q. How did you do it? A. I have a pit in my garage connected with the sewer, I laid boards across that and cleaned the remains with a hose the best I could.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. After you got through washing it with the hose, what did you do with it? A. Wrapped it with absorbent cotton and fluid and did that until it was disinfected.

"Q. Did the body give off any odors? A. Not much, as it was buried in lime.

"Q. In conducting your business, do you get bodies that have offensive smells? A. Not a lot. . . .

"Q. You quite often have autopsies and inquests? A. Not quite frequently; occasionally. . . .

"Q. Have you ever handled, in your undertaking parlors, persons killed by trains? A. Yes.

"Q. Which have been dismembered and brought in in pieces? A. Yes.

"Q. Do these attract notoriety? A. Yes, sir.

"Q. And people come up to the funeral home? A. Yes. . . .

"Q. You have considerable ground around your house? A. I have two lots north of my house.

"Q. Did you ever seriously consider building your funeral home next to your home? A. I had thought about it.

"Q. Why didn't you install it there? A. For personal reasons I decided not to."

Plaintiffs adduced substantial testimony that the conduct of an undertaking business in their midst would materially lessen their enjoyment of their homes, and would depreciate the market value of their properties. Touching the effect on the hospital and its patients Doctor Hatcher testified:

"I am one of the plaintiffs and am the owner of and live on property immediately adjoining the proposed funeral home to the south, and operate a hospital on the next location south. . . . My hospital is on the corner and is a three-story building which I built and have operated a number of years . . . In the summer time my hospital windows are open, and the south end of the proposed funeral home would be forty-two feet from the north end of the hospital. The conducting of funeral services in the proposed home would be heard by my patients in the hospital and such services would affect my patients. I think nearly everyone has an abhorrence of death, and death has a depressing effect. The investment in the Hatcher hospital is somewhere around $100,000. . . . The distance between the hospital and proposed funeral home is seventy feet.

"I have been objecting to the idea of a funeral home . . . and the effect it would have on patients looking down on the funeral of one of their own family. . . .

"When people come to the hospital they are usually depressed. We try to

restore them to health and life. We try to make things as agreeable and pleasurable as possible to that end."

*Examination by the Court:*

"Q. I suppose the whole psychology of a hospital and funeral home is different? A. I think so.

"Q. A hospital tries to make things cheerful to its patients? A. Yes.

"Q. You don't publicly try to let people know when they are taking dead bodies away? A. No, sir.

"Q. And at a funeral home everybody knows a funeral is there? A. Yes, sir.

"Q. You try to get them away without the public knowing it? A. Yes, sir.

"Q. Would the fact that patients know that there is a funeral, that somebody has died, have any psychological effect upon the patient that was living? A. Yes, sir. I could recite one very distinct case.

"Q. You don't like the other patients to know about it? A. No, sir.

"Q. Would there be any way to keep your people from knowing that a funeral was over there? A. No, sir."

The trial court made findings as follows:

"The court further finds that the installing, equipping, maintaining and operating of a funeral home of the character proposed to be operated by the defendant upon the above-described lots, in a residential district of the city of Wellington, would constitute a nuisance as to the owners of near-by property and that the property of said owners would be materially reduced in value by the maintenance and conduct of such business.

"The court further finds that the comfort, repose and enjoyment of the homes of the plaintiffs would be materially diminished by the mental depression and distress caused by the constant going and coming of hearses, the frequent taking in and out of dead bodies, the frequent funerals with the attending mourning, hymn singing and attending noises, thoughts of the unknown dead in the morgue, the thought of autopsies, embalming and other matters commonly associated in the mind of the average person with a morgue to the extent that the power of resistance to disease of these plaintiffs would be lowered by the resultant mental depression and distress, rendering such persons more susceptible to disease, and that the plaintiffs would be deprived of the use, comfort, repose and enjoyment of their homes to which they are entitled, and that by reason of the foregoing the plaintiffs are entitled to a permanent injunction."

Judgment was entered accordingly and defendant appeals, urging certain objections to the judgment, which will be considered *seriatim.*

His first proposition is that a funeral home is not a nuisance *per se.* On that point there neither is nor can be any dispute. This court has already so declared. (*Leland v. Turner,* 117 Kan. 294, 230 Pac. 1061.) But it is just as thoroughly settled in this and many other jurisdictions that an undertaking establishment in a

residential district of a city may be a nuisance to the people residing in the immediate vicinity. (*Leland v. Turner*, supra, and citations therein.) Other recent cases not cited in *Leland v. Turner* are *Higgins v. Bloch*, 213 Ala. 209; id., 216 Ala. 153; *Osborne v. Shreveport*, 143 La. 932, 3 A. L. R. 955; *Dillon v. Moran*, 237 Mich. 130; *Beisel v. Crosby*, 104 Neb. 643; *Jordan v. Nesmith*, 132 Okla. 226; *Blackburn v. Bishop*, (Tex. Civ. App.) 299 S. W. 264; *Bragg v. Ives*, 149 Va. 482.

A distinction is sought to be made between the present case and that of *Leland v. Turner*, supra, in that this defendant procured a permit from the city for the remodeling of the property into an undertaking establishment, while in *Leland v. Turner* the defendant was refused such a permit and constructed the establishment under the pretense of erecting a residence. That distinction does exist, but it is not controlling. Moreover, the city ordinance under which this defendant obtained a permit went no further (and could go no further) than to declare that so far as the city of Wellington was concerned defendant was free to remodel the property as he proposed to do. Certainly a permit by the city to erect and conduct a morgue on the premises will not render it exempt from injunction and abatement if it be in fact a nuisance to private persons especially aggrieved by its presence or by the manner in which it was conducted. In *Donaldson v. Powell*, 123 Kan. 232, 233, 254 Pac. 1033, it was said:

"It has been held that a private individual who is injured thereby may maintain an action to enjoin the maintenance of a cancer hospital (*Stotler v. Rochelle*, 83 Kan. 86, 109 Pac. 788); a horse and mule market (*Winbigler v. Clift*, 102 Kan. 858, 172 Pac. 537); an undertaking establishment (*Leland v. Turner*, 117 Kan. 294, 230 Pac. 1061); and a rock crusher (*King v. American Rock Crusher*, 119 Kan. 618, 619, 240 Pac. 394.)" (p. 233.)

The sufficiency of the evidence to sustain the judgment is next debated. The function of fact-finding is one peculiarly within the province of the trial court; but a careful perusal of the record discloses no lack of evidence that the maintenance of defendant's proposed undertaking establishment and its operation would have injurious effects, mental, physical and material, to the plaintiffs whose homes are in immediate proximity thereto; and particularly would its presence and operation be detrimental to the welfare of the patients in Doctor Hatcher's hospital, located second door from defendant's proposed funeral home.

A sedulous perusal of all the leading cases reported since *Leland v. Turner* was decided leaves the court satisfied with what was there said. The differences between the facts of that case and the one at bar are too slight to permit the two cases to be distinguished in principle. As was said in *Beisel v. Crosby,* supra:

"There is no fixed or arbitrary rule, however, governing cases of this kind. Each case must be determined by the facts and circumstances therein." (p. 648.)

The facts in this case warranted the judgment, and it is affirmed.