B. L. SCALLET and HARRY H. GOLDFADER, Trustees of CLAYSHIRE, a Subdivision in the County of St. Louis, Missouri, and CLAYSHIRE IMPROVEMENT ASSOCIATION, a Corporation, Plaintiffs-Appellants and LESLIE E. PORTNOY et al., Intervenors-Appellants, v. WILLIAM A. STOCK, and EMILY STOCK, his wife, W. A. STOCK, d/b/a W. A. STOCK UNDERTAKING COMPANY, and GALE HENDERSON, Defendants-Respondents, No. 42937—253 S. W. (2d) 143.

Division Two, December 8, 1952.

722

*Lewis, Rice, Tucker, Allen & Chubb, James A. Singer* and *Noah Weinstein* for appellants; *Jerome W. Sandweiss* of counsel.

*Flynn & Parker, Francis C. Flynn* and *Norman C. Parker* for respondents.

BOHLING, C.—B. L. Scallet and Harry H. Goldfader, as Trustees of Clayshire subdivision within the city of Clayton, St. Louis county, Missouri, under an indenture of trust dated March 5, 1945, and Clayshire Improvement Association, a non-profit corporation organized for the improvement, protection and maintenance of said subdivision, and certain intervenors, property owners of said subdivision, prosecute this action to enjoin William A. Stock and Emily Stock, his wife, as owners, William A. Stock, doing business as W. A. Stock Undertaking Company, and Gale Henderson, an architect and builder, from erecting a mortuary and parking lot on Lots 1, 2, 3 and 4, in Block 8, of said Clayshire subdivision. The trial resulted in a judgment in favor of defendants, and the petitions of plaintiffs and intervenors were dismissed as to said Lots 1 and 2 upon which defendants were erecting a mortuary, and dismissed without prejudice as to said Lots 3 and 4 which defendants intended to use for the parking of automobiles. The evidence was that the operation of the mortuary would damage some property owners (intervenors) in excess of $7,500. This is sufficient to vest appellate jurisdiction here. Rombauer v. Compton Heights Christian Church, 328 Mo. 1, 40 S. W. 2d 545, 550[2].

Plaintiffs, the term includes intervenors, contend the erection and maintenance of the mortuary constitutes a violation of certain pro-

visions of the zoning ordinance of the city of Clayton and also a violation of certain restrictive covenants of the aforesaid indenture of trust. With a general statement of the facts involved, the particular facts may be developed in connection with the issues presented under the respective instruments.

A plat establishing Clayshire subdivision was filed in the office of the recorder of deeds for St. Louis county on March 19, 1945; and on said date the indenture of trust was recorded. It placed certain restrictions [145] on the property within said subdivision and named Walter A. Beck and Jack Portnoy as trustees for the purposes of the trust.

Clayshire subdivision lies west of Brentwood boulevard and north of Clayton road at their intersection. These streets are arterial thoroughfares, 60 feet in width, and carry tremendous volumes of traffic. The subdivision consists of 135 lots of which 13 on the outer rim of the subdivision are available for business property, and the other 122 lots are reserved for residential purposes, a number of them in the blocks having lots for business purposes may be used for "multiple dwellings."

William A. Stock had been engaged in the undertaking business since 1919 at Grand and Florissant in the city of St. Louis. In 1950 he and his wife, Emily Stock, acquired title to said Lots 1, 2, 3 and 4. Under the zoning ordinance (originally enacted in 1944), as amended, and also under the plat and indenture of trust for Clayshire subdivision said Lots 1 and 2 were available as business property "G. Commercial District," embracing "undertaking establishments"; and Lots 3 and 4 were available for multiple dwellings but not for commercial or business purposes. The trust indenture contemplated that the plans and specifications for buildings in the subdivision be approved by the trustees. Defendants secured the written approval of Trustee Beck to the plans for the mortuary in March, 1951, Mr. Beck stating he had been attempting to resign and was not too much interested in what went on there. Defendant Stock testified they did not attempt to locate Trustee Portnoy; but Mr. Portnoy testified he refused to give his approval, and the first he knew of Mr. Beck's approval was when, upon his refusal, he was so informed and asked why he would not approve.

The mortuary was under construction at the time of trial, being situated partly on Lot 1 and partly on Lot 2. The investment was estimated to approximate $165,000. The cost of erecting the building was estimated at $130,000, and its architecture was described as tasteful, "a very attractive building."

Walter A. Beck was succeeded as trustee by B. L. Scallett on April 9, 1951, and Jack Portnoy was succeeded as trustee by Harry H. Goldfader on April 18, 1951. On April 20, 1951, the new trus-

tees notified the building commissioner's office of the city of Clayton of their appointment as trustees.

Trustees Scallet and Goldfader each testified that they refused to approve the plans for the mortuary. The plans were displayed at a meeting of the Clayshire Improvement Association on May 3, 1951; and, Mr. Stock having requested an open meeting if there were opposition, arrangements were made for such a meeting on May 10, 1951. It was then decided to oppose the plans for the mortuary.

However, on May 7, 1951, and prior to the open meeting arranged for May 10th at the request of Mr. Stock, an application was filed and on the same day a permit was issued to defendants for the erection of a mortuary on said Lots 1, 2, 3, 4. The permit was issued by John O'Sullivan, director of safety of the city of Clayton, who testified he was under Alden B. Park, building commissioner of said city. The following appeared below the signature on the application: "Note—Lots 3 & 4—each 65′ by 120′ will be used for parking."

█ Plaintiffs first contend the mortuary building violates the zoning ordinance provisions requiring a rear yard of 25 feet. The evidence established that the building will be much less than the ordinance requirements from the rear lot line of Lot 2. A determination of the issue does not require the setting forth of the applicable ordinance yard provisions; i.e., Art. II, § 1, Subsecs. 43 and 45; Art. X, § 5, Subsec. 3, and Art. XV, § 1, Subsec. 4.

Defendants say plaintiffs, not having availed themselves of the adequate legal remedies authorized under the provisions of the ordinance, consistent with the Zoning Enabling act, §§ 89.100 and 89.110, RSMo 1949, for a review of any decision of an administrative officer by the board of adjustment and upon certiorari by the circuit court, may not successfully urge the instant contention as a ground for injunctive relief in this proceeding. Hernreich [146] v. Quinn, 350 Mo. 770, 168 S. W. 2d 1054, 1058[4], and Superior Press Brick Co. v. City of St. Louis, Mo. App., 155 S. W. 2d 290, 294[1-4, 6].

Plaintiffs, on the other hand, say the instant proceeding falls within the ruling in Evans v. Roth, 356 Mo. 237, 201 S. W. 2d 357, 362[4].

In the Hernreich case, supra, so far as material, the St. Louis board of adjustment issued a permit to occupy as a residence a garage converted into a residence which violated rear yard zoning ordinance requirements of a minimum depth of 25 feet. Court en Banc stated: "To attack that decision [of the board of adjustment] the Berards [adjoining neighbors] were bound to exhaust their remedy by certiorari under § 176 of the ordinance before they

could resort to an action at law or in equity * *.'' The Superior Press Brick Co. case is to like effect.

The holdings in the Hernreich and Superior Press Brick Co. cases, supra, were approved in Evans v. Roth, supra. In Evans v. Roth, after unsuccessful attempts to have a building in a district zoned for dwellings, i.e., houses occupied by not more than two families, re-zoned as an apartment house, the owner permitted it to be occupied as four units for dwelling purposes. Interested parties instituted suit to enjoin its use as an apartment in violation of the zoning ordinance. The plaintiffs in that case were not aggrieved by the determinations of the zoning authorities but by the unauthorized use to which the owners subjected the premises. We held the plaintiffs could proceed in a court of equity without resorting to the zoning authorities for an abatement of the offending use of the property. The Evans case differs in that the defendants in the instant case are acting under a permit granted by the zoning authorities, as in the Hernreich case. Plaintiffs' authorities do not establish reversible error on the issue under discussion.

Plaintiffs next contend that the erection of the mortuary and parking lot violates restrictions in the indenture of trust and constitutes a private nuisance.

The indenture of trust provided, so far as material, that:

''No nuisance of any kind shall be erected, maintained or operated in any part of this subdivision.''

Also, that all lots in said subdivision were to be used ''for single family residences,'' except, as hereinbefore stated, that a limited number of designated lots of the subdivision, including said Lots 1 and 2, ''may be used for Business Property''; and except that certain designated lots, including said Lots 3 and 4, ''may be used for Multiple Dwellings.''

''No building shall be erected, improved or altered unless and until the plans and specifications have been approved in writing by the Trustees.''

It further provided that all covenants and restrictions of said trust indenture ''shall attach to and run with the land'' and bind all persons claiming them until January 1, 1970, and for their continuation until January 1, 1980, unless changed by a majority of the then lot owners of record.

The trustees were vested with authority to change the stated restrictions, provided the changes did not conflict with the zoning ordinances of the city of Clayton.

The fact that the site is zoned by the city for business property, including ''undertaking establishments,'' does not preclude injured property owners from enjoining a business thereat consituting a private nuisance in the absence of other factors offsetting their

rights. It is the peculiar nature and the location of the business, not the fact that it is a business, that constitutes the private nuisance and ground for equitable relief. Sultan v. Parker-Washington Co., 117 Mo. App. 636, 643, 93 S. W. 289, 291; Killian v. Brith Sholom Congregation, Mo. App., 154 S. W. 2d 387, 394; Rockenbach v. Apostle, 330 Mich. 338, 47 N. W. 2d 636, 639[4]; Sweet v. Campbell, 282 N. Y. 146, 25 N. E. 2d 963, 964; Hatcher v. Hitchcock, 129 Kan. 88, 281 Pac. 869, 871[1]; Re Appeal of Perrin, 305 Pa. 42, 156 Atl. 305, 307 [8,9]; [147] Annotation, 166 A. L. R. 664; 26 C. J. S. Deeds, § 171, p. 577, n. 67.

The Terminal Railway right-of-way borders what is considered the eastern boundary (extending northwesterly) of Clayshire subdivision from said Lot 1; and a 15-foot embankment shuts off the view to the east opposite Lot 2. Opposite Clayshire subdivision, the east side of Brentwood boulevard is zoned for business property, and business properties also are located on the south side of Clayton road. But the question here is the character of Clayshire subdivision and particularly the use that may be made of the lots involved. Rombauer v. Compton Heights Christian Church, 328 Mo. 1, 40 S. W. 2d 545, 553[11, 12]; Cowherd Development Co. v. Littick, 361 Mo. 1001, 238 S. W. 2d 346, 350[3, 4]; Rockenbach v. Apostle, 330 Mich. 338, 47 N. W. 2d 636, 639[3]; Mutual Service Funeral Homes v. Fehler, Ala., 58 So. 2d 770, 775[13]; 26 C. J. S. Deeds, § 171, p. 576, nn. 59, 60.

Plaintiffs stress the following three Missouri cases.

In Tureman v. Ketterlin, 304 Mo. 221, 263 S. W. 202, 204[1-3], 43 A. L. R. 1155, defendants intended to operate an undertaking establishment, morgue and funeral home in a district which was in a period of transition, no new homes were being built and business was entering here and there. But the district was still "essentially residential in character." The court stated: "An undertaking establishment is not a nuisance per se. * * * It may become a nuisance, however, from the manner in which it is conducted or because of the place at which it is maintained * * *." The court concluded the business constituted a nuisance at the location in question.

The "funeral home" in Streett v. Marshall, 316 Mo. 698, 291 S. W. 494, 497[3, 4], was not an undertaking establishment in the full sense of the term, being more accurately characterized as a "mortuary chapel; a place devoted to the reception of the dead and the performance of funeral rites." Its operation in a district characterized as "exclusively residential" was enjoined, because: "Constant reminders of death, such as an undertaking establishment, and the activities connected with it give rise to, impair in a substantial way the comfort, repose, and enjoyment of the homes which are subject to them"; and its intrusion into localities devoted exclusively to homes is not justified, as it materially detracts from the comfort and happi-

ness of the residents and ruinously depreciates the values of their real estate.

Clutter v. Blankenship, 346 Mo. 961, 144 S. W. 2d 119, 121[11], followed the Tureman and Streett cases, supra, stating: "* * * A funeral home located in a purely residential neighborhood does constitute a nuisance," and that a majority of the adjudications so hold. See Rockenbach v. Apostle, 330 Mich. 338, 47 N. W. 2d 636; 14 Am. Jur. Covenants, etc., § 261, p. 637; 26 C. J. S. Deeds, § 165, b, p. 540.

The evidence in the instant case, like that in the Missouri cases supra, was to the effect that the mortuary would have a depressing effect upon the residents, would depreciate the values of their properties, and would create an added safety hazard within the residential area. There are, however, several distinctions. The plat of the subdivision shows a 300-foot square at the southeast corner of the subdivision for a convenient shopping center. Immediately to the north of this square are two lots, then Francis Place, a 50-foot street angling southwest across Brentwood boulevard, then Lot 1, here involved, all lots fronting east on Brentwood, then Lot 2, here involved, fronting on Francis Place. Proceeding west along Clayton road are three lots, then Clayshire drive, 70 feet wide, then 6 lots, all lots fronting on Clayton road. All of said lots are available for business property under the indenture of trust and the zoning ordinance; and a restaurant, a bottle goods store, a beauty parlor, an automobile agency and five other stores or shops are located thereon. Within the subdivision are multiple dwellings of a value around $55,000 each and single family residences of a value between $25,000 and $30,000. It cannot be [148] said that the mortuary on Lots 1 and 2 is located within a district "essentially," "purely," or "exclusively" residential, and the Tureman, Clutter and Streett cases, supra, are distinguishable.

The trustees had made no changes in the restrictions of the indenture of trust or adopted any regulations to guide their acts in the administration of their trust, although said indenture vested them with limited authority to change the restrictions. Trustee Beck approved but Trustee Portnoy did not approve the plans for the mortuary prior to resigning in April, 1951. It was established that plans for buildings in Clayshire subdivision on file in the building commissioner's office upon which permits had been issued contained the approval of but one of said trustees in a number of instances. Subsequent to the above mentioned meetings on May 3 and May 10, 1951, Trustees Scallet and Goldfader addressed a letter to defendants and a copy to the city building commissioner in which they directed attention to the notation on the application for a permit that Lots 3 and 4 "will be used for parking," and stated that said lots "may not be used for business property," making specific reference to the indenture of trust. The letter continued:

"We call this to your notice and attention at this time so that you may suffer no loss or hardship by being unable to use said Lots 3 and 4 in Block 8' of Clayshire Subdivision for parking purposes, and we further call this to your attention for the reason that if the building permit which you seek, or which you have obtained from the City of Clayton is contingent upon the use of Lots 3 and 4 for parking, as indicated on your application, that permit is of necessity invalid.

"It is our intention to enforce the restrictive use of Lots 3 and 4 in Block 8, and we are calling this to your notice at this time and ask your cooperation to avoid inconvenience and expense to yourselves, as it is not our intention to waive any of our rights in the matter, but to enforce those rights for the benefit of those living within the Subdivision."

At the trial it was stipulated that the building was to be subject to a restricted use in that "no bodies will be embalmed or prepared for burial on the premises but will be brought to the premises after they have been prepared for burial." Mr. Stock testified that they did not intend to put any caskets "in this proposed establishment" and expected to transport all customers to the other establishment for the selection of caskets. This eliminates some objectional features.

We conclude the record does not establish plaintiff's right to the relief sought, at least not in full measure.

This brings us to a consideration of Lots 3 and 4. Defendants' application was "to build a mortuary on Lots Nos. 1, 2, 3, 4," aforesaid, with a notation that Lots 3 and 4 "will be used for parking." The building permit, as issued, authorized the building of "a mortuary on Lots Nos. 1, 2, 3, 4." Although someone in the building commissioner's office struck out the figures "3" and "4" after the word "Lots" in the body of the application and on the commissioner's copy of the permit, the permit issued to defendants was not recalled nor was the application amended to conform to the stated action of the building commissioner's office. The use of said Lots 3 and 4 for business property is prohibited by the indenture of trust and the zoning ordinance. If the permit stands as issued and said Lots 1, 2, 3 and 4 are to be used for business purposes, plaintiffs are entitled to injunctive relief under the expressed provisions of the indenture of trust against the maintenance of a nuisance and against the use of Lots 3 and 4 as business property. Rhodes v. A. Moll Grocery Co., 231 Mo. App. 751, 95 S. W. 2d 837. It is true defendant Stock testified to the effect that if they could use Lots 3 and 4 for parking they would dispense with Lot 1 as a parking place and beautify it; "but since there is an objection to 3 and 4 we use 1." However, during the course of the trial defendants' counsel stated Lots 3 and 4 were [149] intended for parking until this

suit was filed, "there is no dispute about it"; and later during the trial: "The Court: I understood you gentlement to say that the idea of using 3 and 4 for parking had been given up. Mr. Gunn: No, they object to our using 3 and 4 for parking." Defendants' Ex. 3, "a blue print of the entire project," shows that Lots 3 and 4 are marked "Parking." In their brief defendants seek to sustain the judgment of dismissal as to Lots 3 and 4 on the ground no steps had been taken at the time of trial for utilizing Lots 3 and 4 for parking purposes.

Plaintiffs are here relying upon covenants in the indenture of trust expressly prohibiting a nuisance and restricting the use of Lots 3 and 4 to multiple dwelling or residence property. In the circumstances: "The fact that no violation has actually been committed is not essential to give a court of equity jurisdiction to relieve against a breach of the covenant, but it is sufficient that a breach is intended." 43 C. J. S. Injunctions, § 87, p. 583, n. 14; 14 Am. Jur. Covenants, Conditions and Restrictions, § 339, p. 666, n. 1; Clutter v. Blankenship, 346 Mo. 961, 144 S. W. 2d 119, 122[13]; Kenwood Land Co. v. Hancock Inv. Co., 169 Mo. App. 715, 725, 155 S. W. 861, 865[8]. The case stressed by defendants, Holke v. Herman, 87 Mo. App. 125, involved a different issue.

We conclude the facts entitle defendants to erect and use, as restricted at the time of trial, the mortuary on Lots 1 and 2, and plaintiffs are entitled to some injunctive relief but not the full measure of relief sought. Accordingly, the judgment is reversed with directions to modify the decree so as to permit defendants to maintain a restricted mortuary conforming to the stipulation and the testimony of defendant Stock with respect to the use to be made of the mortuary, and that the decree grant plaintiffs an injunction against the use of the mortuary on Lots 1 and 2 other than as above stated and against the use of Lots 3 and 4 for business property, including parking. The costs are assessed against defendants. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.